430 So.2d 307 (1983)
James BATTLES, Jr., et al., Plaintiffs and Appellants,
v.
W.R. ADERHOLD et al., Defendants and Appellees.
No. 82-713.
Court of Appeal of Louisiana, Third Circuit.
April 13, 1983.
*308 Kramer & Hammill, Bernard Kramer, Alexandria, for plaintiffs and appellants.
Cook, Yancey, King & Galloway, Sidney Cook, Shreveport, Gist, Methvin, Hughes and Munsterman, H.B. Gist, Jr., Gold, Little, Simon, Weems & Bruser, Herbert J. Mang, Provosty, Sadler & deLaunay, LeDoux, Provost, Alexandria, for defendants and appellees.
Before DOMENGEAUX, LABORDE and YELVERTON, JJ.
LABORDE, Judge.
This is a medical malpractice suit brought by John Battles, Jr., the widower of Sarah Battles, and their children, Donald Ray Battles, James C. Battles, Gloria Jean Battles Collins, Madie Battles Pierson and Rose Marie Battles, for damages they allegedly sustained as a result of Sarah Battles' death following thyroid surgery at Rapides General Hospital in Alexandria, Louisiana. Named as defendants were Dr. Harry Brian, the surgeon who performed the thyroidectomy, Dr. W.R. Aderhold, an anesthesiologist who administered the anesthesia, Alexandria Anesthesia Service, the partnership in which Dr. Aderhold is a member, Dr. Walter Preau, an emergency room physician who attended Sarah Battles after her surgery, Rapides General Hospital and Hartford Fire Insurance Company, the liability insurer of Dr. Brian, Dr. Aderhold and Alexandria Anesthesia Service.
During the jury trial, plaintiffs voluntarily dismissed Dr. Brian and his insurer, Hartford. After plaintiffs rested, the court directed a verdict in favor of Dr. Preau. Subsequently, a directed verdict was granted in favor of Dr. Aderhold, Alexandria Anesthesia Service and their liability insurer, Hartford.
After deliberations, the jury returned a verdict in favor of the remaining defendant, *309 Rapides General Hospital. Judgment was rendered in favor of Rapides General Hospital pursuant to this verdict. Plaintiffs appeal. We affirm.
The issues presented on appeal are as follows:
1) Whether or not the trial court erred in directing a verdict in favor of Dr. Walter Preau.
2) Whether or not the trial court erred in directing a verdict in favor of Dr. W.R. Aderhold.
3) Whether or not the jury erroneously rendered a verdict in favor of Rapides General Hospital.
On January 11, 1979, Sarah Battles underwent a thyroidectomy at Rapides General Hospital[1]. The surgery was performed at approximately 8:00 A.M. by Dr. Harry Brian. General anesthesia was administered by Dr. W.R. Aderhold. Following surgery and an uneventful recovery period in the recovery room, Sarah was returned to her room on the sixth floor.
At approximately 11:00 A.M., Sarah arrived at her room. Two R.N. applicants checked her vital signs and put her into her bed.[2] Shortly thereafter, Nurse Mary Heald, the head nurse on the sixth floor, examined Sarah and found her to be in good condition.
Sometime thereafter, one of the R.N. applicants called Nurse Heald back to Sarah's room. Nurse Heald found that she had become somewhat restless. Nurse Heald decided to call Dr. Brian to see whether he wished to prescribe medication. Nurse Heald learned that Dr. Brian had left the hospital and was in route to England Air Force Base. A message for him was left at the base.
While waiting to leave a message for Dr. Brian, Nurse Heald received word over the intercom that Sarah's condition had worsened. Nurse Heald sent Carlyess Burns, an experienced registered nurse, to Sarah's room to check her condition. After leaving the message for Dr. Brian, Nurse Heald returned to Sarah's room. Without actually entering the room, Nurse Heald heard that Sarah had developed stridor.[3] Determining that Sarah might require intubation, Nurse Heald called Dr. Aderhold.[4] Dr. Aderhold was unable to respond and come to the sixth floor.
After the conversation with Dr. Aderhold, Nurse Heald called the nursing supervisor to secure the services of an anesthesiologist. At the same time Nurse Heald was placing this call, Nurse Burns called the emergency room to obtain the services of the emergency room physician, Dr. Walter Preau.
Nurse Heald then returned to Sarah's room bringing with her a crash cart.[5] Nurse Heald set up the "ambu bag", connected the cardiac monitor, removed Sarah's dressing and began removing the sutures. Before Nurse Heald completed removal of the sutures, Dr. Preau arrived.
Upon Dr. Preau's arrival, he found Sarah to be in respiratory distress and determined that she needed to be intubated. His first attempt at intubation was unsuccessful. Likewise, his second attempt was unsuccessful *310 due to Sarah's physique and the fact that she was "bucking" the tube.[6] After Dr. Preau's second attempt, Dr. Ronald Lewis, an anesthesiologist, who came to Sarah's room at the request of the nursing supervisor, was able to successfully intubate the patient. Dr. Lewis was successful in his effort because at this point Sarah had become flaccid and was no longer bucking the tube.
As the intubation was completed, Dr. Brian arrived at Sarah's room. Sarah was taken back to surgery and a tracheotomy was performed[7]. After the tracheotomy, it was discovered that Sarah had sustained brain damage as a result of lack of oxygen to her brain. Sarah never regained consciousness and died on January 7, 1980.
Pursuant to LSA-R.S. 40:1299.41 et seq., plaintiffs' claim was submitted to a medical review panel consisting of Dr. J. Browne Larose, Jr., an emergency specialist, Dr. Palmer Texada, a general surgeon, and Dr. John Adriani, an anesthesiologist. On August 28, 1981, the medical review panel rendered its decision finding that:
"1) The evidence supports the conclusion that the defendant, Rapides General Hospital, failed to comply with the appropriate standard of care as charged in the complaint.
2) The evidence does not support the conclusion that the defendants, Dr. Harry Brian and Dr. Walter Preau, failed to meet the applicable standard of care as charged in the complaint.
3) The evidence shows that with respect to the defendant, Dr. W.R. Aderhold, there is a material issue of fact, not requiring expert opinion, bearing on the liability for consideration by the court."
On September 2, 1981, Dr. John Adriani filed a dissenting opinion wherein he dissented from the finding that Dr. Aderhold could be at fault.
Plaintiffs' case came to jury trial on July 12, 1982. During trial, plaintiffs voluntarily dismissed Dr. Harry Brian. Directed verdicts were rendered in favor of Dr. Preau and Dr. Aderhold and a jury verdict was rendered in favor of defendant, Rapides General Hospital.
Plaintiffs perfected this appeal from the judgments dismissing their claims against the defendants, Dr. Preau, Dr. Aderhold and Rapides General Hospital.
Plaintiffs first contend that the trial court erred in granting a motion for a directed verdict in favor of Dr. Walter Preau.
This court has adopted the following standard to determine whether a motion for a directed verdict should be granted:
"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidencenot just that evidence which supports the non-mover's casebut in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury."
Campbell v. Mouton, 373 So.2d 237 (La.App. 3rd Cir.1979); Guillory v. Buller, 398 So.2d 43 (La.App. 3rd Cir.1981).
A plaintiff's burden of proof in a medical malpractice suit is set forth in LSA-R.S. 9:2794 which reads as follows:

*311 A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., or a dentist licensed under R.S. 37:751 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
The record reveals that Dr. Preau responded promptly to Nurse Burns' call for aid. Dr. Preau traveled from the emergency room on the first floor to Sarah's room on the sixth floor in approximately two minutes. Upon his arrival, Dr. Preau made a general inquiry as to Sarah's condition. Dr. Preau, who had never seen or treated Sarah before that day, learned that Sarah had undergone thyroid surgery and was now in respiratory distress. Dr. Preau determined that Sarah needed an airway so he immediately attempted to intubate her.
Dr. Preau testified that he was unable to intubate Sarah because he could not get a good visualization of the vocal chords. Dr. Preau stated that Sarah was straining and having muscle spasms in her neck so that he could not get a clear view of the anatomy of her lower pharynx.
Dr. J. Browne Larose, an emergency specialist who was a member of the medical review panel in this case, was questioned extensively as to the performance and actions of Dr. Preau in this situation. Dr. Larose testified that Dr. Preau was correct in immediately trying to intubate this patient to establish an airway. Dr. Larose further testified that it is difficult to intubate a person like Sarah who has a short, stocky neck and that it is extremely difficult to intubate this same person when they are bucking and pitching.
Dr. Larose stated that he found no fault in Dr. Preau's conduct in responding to this call. It was Dr. Larose's opinion that Dr. Preau's conduct was up to the standard of an emergency physician.
We conclude that plaintiffs have failed to meet their burden of proof imposed by LSA-R.S. 9:2794. After considering all the evidence, we conclude that reasonable men could not arrive at a verdict against Dr. Preau. Therefore, we affirm the judgment granting Dr. Preau a directed verdict.
Plaintiffs' second contention is that the trial court erred in granting a directed verdict in favor of Dr. W.R. Aderhold.
Dr. Aderhold moved for a directed verdict on two occasions during the jury trial. Dr. Aderhold first moved for a directed verdict at the close of plaintiffs' case. This motion was denied. Subsequently, Dr. Aderhold moved for a directed verdict at the close of all the evidence. The trial court heard arguments from counsel and took the matter under advisement while the court was in recess. When the court reconvened, the trial court, in a well articulated opinion, ruled in favor of Dr. Aderhold dismissing plaintiffs' claim against him.
Plaintiffs argue that Dr. Aderhold was at fault in refusing to come to Sarah's room when Nurse Heald notified him of Sarah's breathing difficulty. Plaintiffs assert that Dr. Aderhold could have easily turned the patient he was attending over to Dr. Lewis and attended the "emergency".
We note, as did the trial court, that there is a factual dispute as to exactly what *312 Nurse Heald conveyed to Dr. Aderhold when she called. Dr. Aderhold testified that he got the impression that there was no emergency, while Nurse Heald's testimony is to the contrary. In any event, assuming that Nurse Heald conveyed that an emergency situation existed, the record shows that Dr. Aderhold's decision to stay with his patient was not a violation of the professional standard of care of his specialty.
The record reveals that at the time Nurse Heald called Dr. Aderhold regarding Sarah's condition, he was administering a blood transfusion to an eighty (80) year old patient with a history of heart difficulty who was undergoing a surgical procedure known as an "aorta-femoral by-pass".[8] The consensus of the experts who testified at trial was that Dr. Aderhold had a primary duty to his patients in the surgical suite and that he had no obligation to go to the sixth floor.
Dr. Sam Wellborn, Chairman of the Department of Anesthesiology at Oschner Clinic in New Orleans, testified that once a patient is returned to the hospital room, the anesthesiologist has no real responsibility to that patient at that point. He further stated that at the time of Nurse Heald's call to Dr. Aderhold, his primary responsibility was to the patient in the operating room. After this testimony, Dr. Wellborn was asked the following questions and gave the following answers:
"Q. So even if he (Dr. Aderhold) had been told that there was stridor in the patient upstairs, do you feel that he fell below the standard ... the standard of care of your profession if he did not leave that patient on the operating table?
A. No sir, I think he upheld the standard of care because in his professional judgment he felt he should be present in the operating suite attending this patient undergoing aortic surgery.
Q. If you would have been in his position, what would you have done?
A. I would have done the same thing."
Dr. Texada testified that the primary responsibility of an anesthesiologist ends when the patient is returned to his room. He further testified that the decision whether or not to leave surgery when an anesthesiologist has a patient under anesthesia and then go to another floor is a matter of professional judgment. Dr. Texada was then asked the following question:
"Q. And if he feels that he cannot go, if he has major surgery or one or two patients in surgery and maybe one in the Recovery Room, even if he has ... has another anesthesiologist working with him, it ... it's not... is it a violation of his professional standards if he chooses to stay with those patients under anesthesia?
A. No, that's his primary responsibility and that's where he belongs. Once the patient leaves the recovery room, they are back in charge of their attending physician."
Dr. Adriani testified that under the circumstances of this case, Dr. Aderhold did not have an obligation to go to Sarah's room. He stated that Dr. Aderhold did everything required of him under the circumstances and that it was his opinion that Dr. Aderhold did not violate any standard of care for an anesthesiologist.
After reviewing the record, we conclude, as did the trial court, that there is no reasonable basis in law or in fact whereby Dr. Aderhold could be found liable to plaintiffs. Thus, the judgment directing a verdict in favor of Dr. Aderhold, Alexandria Anesthesia Service, and Hartford Fire Insurance Company is affirmed.
Plaintiffs' final contention is that they were prejudiced before the jury by the trial court's improvidential granting of the motions for directed verdict to the extent that the jury rendered an erroneous verdict *313 which is contrary to the law and evidence of this case. The record shows that the following interrogatory was answered by eleven of twelve jurors in the negative:
"JURY INTERROGATORIES AND VERDICT
1. Do you find from a preponderance of the evidence that:
A. The nurses at Rapides General Hospital negligently failed to follow the standard of care applicable to nurses in their treatment of Sarah Ann Battles? And

B. The negligence of the nurses of Rapides General Hospital was the proximate cause of Mrs. Battles' illness and death?"
After responding in the negative to this interrogatory, the jury rendered its verdict in favor of Rapides General Hospital. Judgment was signed accordingly.
We first address plaintiffs' assertion that the trial judge improvidently granted the motions for directed verdict. As discussed herein, we have concluded that the trial judge was correct in granting the motions for directed verdict in favor of Dr. Preau and Dr. Aderhold. Therefore, this portion of plaintiffs' contention is without merit. We note that the trial judge was careful not to let his rulings influence the jury. Prior to final arguments by counsel, the trial judge stated the following to the jury:
"You may notice that we are down to one defendant counsel present and three defendants are not here. This is not a matter that should concern you in anyway. You must, and will have to decide the case against each defendant individually and not as a group anyway under the law, so, the fact that Dr. Aderhold or Dr. Preau or Dr. Brian are no longer in the case should not be a factor that you consider for or against the plaintiff or for or against Rapides General Hospital, okay."
We now turn to the main issue of whether or not the verdict rendered by the jury is contrary to the law and evidence in this case. From the outset, we recognize that our review of this jury verdict is limited to a determination of whether or not the jury's verdict is clearly wrong. The jury's findings will not be disturbed by this court unless we find that they are clearly wrong. Soileau v. South Cent. Bell Tel. Co., 406 So.2d 182 (La.1981).
As appears from a reading of the jury interrogatory, one cannot ascertain whether the jury determined that Rapides General was not negligent or whether the jury determined that Rapides General was negligent but such negligence was not the proximate cause of Sarah's death. We assume, and the record clearly supports, that the jury determined that Rapides General was not negligent.
Plaintiffs argue that Rapides General's nurses were negligent in failing to institute the emergency procedure known as "Dr. Quickstep" to obtain help for Sarah and such failure caused an unreasonable delay in the time it took for Sarah to be intubated.
The "Quickstep Procedure" is an emergency procedure adopted by the medical staff of Rapides General Hospital. It is designed to notify certain personnel that an emergency has occurred and to secure the presence of these personnel, together with certain emergency equipment, at the scene of the emergency.
The written policy of the hospital requires that a Quickstep shall be instituted when the patient sustains an actual cardiac arrest, respiratory arrest or displays dilated or contracted pupils. The Quickstep procedure may also be instituted if in the judgment of the nurse, the procedure needs to be called.
Dr. Brian, Dr. Thomas, Dr. Larose and Dr. Glorian L. Hounatanian each testified that there is no need to call a Quickstep procedure if the essential equipment and personnel are already present or on their way to the site of an emergency. Dr. Thomas and Dr. Hounatanian further testified that because a patient develops stridor does not mean that there is an emergency or that the patient is about to have respiratory *314 arrest. According to their testimony, the presence of stridor is a signal that the patient warrants close observation and that the possibility exists that the patient may need to be intubated. Once it is determined that the patient may need to be intubated, the appropriate personnel should be contacted.
The record shows that the nurses of Rapides General kept Sarah under close observation. The moment Sarah became restless and developed a slight wheeze, Nurse Heald, the head nurse was notified. When Nurse Heald detected stridor, she immediately contacted Dr. Aderhold, who as an anesthesiologist, is considered an expert in airway management. Within one minute of Nurse Heald's conversation with Dr. Aderhold, Dr. Preau was summoned. As he was in route to Sarah's room, Nurse Heald brought the crash cart to Sarah's bedside and set up the cardiac monitor and "ambu bag".
The record indicates that Sarah was not in actual respiratory or cardiac arrest prior to Dr. Preau's arrival. Therefore, under the written policy of the hospital, the Quickstep procedure was not required to have been instituted. The record further indicates that upon Dr. Preau's arrival, all the essential personnel and equipment were present to deal with the situation.
The record also shows that no delay was caused by the method used to obtain help for Sarah. Dr. Preau testified that he would not have arrived at Sarah's room any faster had the Quickstep procedure been announced over the intercom. The record further shows that only the emergency room doctor usually responds to a Quickstep procedure.
After reviewing the record, we conclude that it clearly supports a finding that the nurses of Rapides General Hospital were not negligent in failing to institute the Quickstep procedure and that no unreasonable delay was caused by the method Nurse Heald used to obtain aid for Sarah.
For the foregoing reasons, the judgments of the trial court are affirmed. All costs are assessed against plaintiffs-appellants.
AFFIRMED.
NOTES
[1] A thyroidectomy is removal of the thyroid gland.
[2] R.N. applicants are persons who have graduated from nursing school but have not received the results from their State Board examinations. They are given a permit to practice as a registered nurse and are allowed to perform the duties of a registered nurse while awaiting their State Board results.
[3] Stridor is a term used to describe sounds that occur when a patient is having problems breathing. It generally refers to sounds that occur because of problems in the upper portion of the airway.
[4] Intubation is a process by which a tube is inserted into a patient's trachea (windpipe) in order that the patient's airway remains open.
[5] A crash cart is a rolling cabinet which contains emergency equipment including a cardiac monitor, defibrillation equipment, emergency drugs, endotracheal tubes which are needed to intubate a patient and an "ambu bag". An "ambu bag" is a football shaped device into which oxygen can be directed and which can be manually squeezed to force oxygen into a patient's lungs.
[6] "Bucking" is the manifestation of the "gag reflex" which is a reaction of the body to prevent foreign material from entering the trachea. e.g. The characteristic gagging that occurs when a physician places a tongue depressor into the back of the throat.
[7] A tracheotomy is a surgical procedure whereby the trachea is cut and a tracheotomy tube is inserted into the trachea so that the patient breathes directly through the tracheotomy tube.
[8] An "aorta-femoral by-pass" is a lengthy surgical procedure designed to alleviate poor circulation to the lower extremities of the body.