591 So.2d 767 (1991)
Michael David ISEAH, et al., Plaintiffs-Appellants,
v.
E.A. CONWAY MEMORIAL HOSPITAL, et al., Defendants-Appellees.
No. 23053-CA.
Court of Appeal of Louisiana, Second Circuit.
December 4, 1991.
Rehearing Denied January 16, 1992.
Writ Denied April 3, 1992.
*768 Hunter, Scott, Blue, Johnson & Ross by James E. Ross, Jr., Monroe, for plaintiffs-appellants.
Hudson, Potts & Bernstein by Jesse D. McDonald, Monroe, for defendants-appellees.
Before SEXTON, LINDSAY, and BROWN, JJ.
SEXTON, Judge.
In this medical malpractice action, the plaintiffs, Michael David Iseah and Karen Elaine Iseah, appeal an adverse judgment following a bench trial, in favor of the defendants, E.A. Conway Memorial Hospital and the State of Louisiana, through the Department of Health and Human Resources. The judgment rejected plaintiffs' claims for damages for the alleged wrongful death of their father, 44-year-old Otis Iseah. We affirm.
Otis Iseah had a significant history of emergency medical treatment. He additionally had a history of alcohol and marijuana abuse, which apparently contributed significantly to his medical problems. Mr. Iseah first sought emergency medical treatment at E.A. Conway Hospital in Monroe on January 16, 1984. He had previously been treated on several occasions in 1983 at the St. Francis Medical Center. Later occasions on which Mr. Iseah sought treatment or was admitted to E.A. Conway were July 21, 1984; August 19, 1984; November 21, 1984; December 4, 1984; March 10-19, 1985; October 13, 1985; October 14-18, 1985; January 10, 1986; January 21, 1986; and January 28-31, 1986. Mr. Iseah's usual complaints were nausea and vomitting. He also occasionally complained of chest pains. Invariably, Mr. Iseah's complaints were diagnosed as attributable to his long history of alcohol abuse. Echocardiograms taken in November 1984 and March 1985 revealed evidence of heart disease, specifically thickened mitral valve leaflets.
On his final visit to E.A. Conway, Mr. Iseah was diagnosed as suffering from subacute bacterial endocarditis (SBE), a rare infectious disease of the valves of the heart. SBE occurs when bacteria, often of a variety common in the human mouth, enter the bloodstream and ultimately attach themselves to the valves of the heart. Especially susceptible are previously damaged heart valves. SBE is evidenced by prolonged low grade fever, which spikes to *769 a higher fever, and a new heart murmur or a change in an existing heart murmur. It is diagnosed by obtaining a series of blood cultures from the patient. On January 31, 1986, Mr. Iseah was transferred to the LSU Medical Center in Shreveport where, despite surgery, he died as a result of SBE on February 3, 1986.
The plaintiffs filed suit for damages alleging that the defendants, through their physician employees, were negligent and that such negligence constituted medical malpractice resulting in the death of Mr. Iseah. Specifically, plaintiffs claim that Mr. Iseah's SBE should have been diagnosed on either of his two most recent emergency room visits prior to his final visit, the emergency room visits of January 10, 1986 and January 21, 1986.
Following a bench trial, the trial court rendered a written opinion denying plaintiffs' claims for damages. The trial court noted the nature of SBE, that it is a rare disease and one difficult to diagnose. The trial court also noted Mr. Iseah's history of alcohol and marijuana abuse and his numerous appearances at the E.A. Conway emergency room with complaints of chest and stomach pains, vomitting, and symptoms of delirium tremens. Echocardiograms taken during these earlier visits showed evidence of heart murmurs. The trial court noted that on January 10, 1986, Mr. Iseah exhibited symptoms similar to those evidenced on previous visits, but there was no evidence of a heart murmur. On January 21, 1986, Mr. Iseah was treated with nitrogylcerine for severe angina pectoris. The trial court noted that on both. January 10 and 21, 1986, Mr. Iseah had been instructed to return later to other sections of the hospital, which instructions Mr. Iseah ignored. The trial court further noted that when Mr. Iseah was first admitted on January 28, 1986, there was initially no low grade fever with spikes to a higher temperature nor evidence of a heart murmur. Correspondingly, there was no suspicion of SBE. On Mr. Iseah's last admission, a heart murmur distinctively different from any noted previously subsequently manifested itself, leading to the suspicion of and eventual diagnosis of SBE. The trial court found no indication as to "exactly" when SBE developed in Mr. Iseah. The court concluded it could have been "in the last few days of his life or it could have been over a period of weeks."
The trial court found that E.A. Conway's emergency room physicians acted in accord with the general standard of care. In short, the trial court found plaintiffs had failed in their burden of proving malpractice. Plaintiffs appeal this judgment.

SEQUESTRATION OF WITNESSES
Plaintiffs argue that the trial court committed reversible error in exempting from the rule of sequestration defendants' expert witnesses where those witnesses also constituted fact witnesses. The defendants predominantly relied upon for their expert medical testimony those physicians who had treated Mr. Iseah during his numerous visits to E.A. Conway Hospital.
Expert witnesses are generally exempted from the rule of sequestration. LSA-C.E. Art. 615 A(3). However, Comment (e) to LSA-C.E. Art. 615 states, in pertinent part:
Ordinarily expert witnesses should not be sequestered except when failure to do so would be manifestly unfair to another party. Where an expert is primarily a fact witness and is not otherwise needed to assist counsel, and particularly where he is an employee of a party, it would be appropriate to exclude him from the courtroom while other witnesses are testifying.
In the instant case, the majority of defendants' physician witnesses would appear to fall under the exception to the general rule that expert witnesses are not subject to sequestration. A number of the witnesses were primarily fact witnesses, testifying to the treatment they provided Mr. Iseah. They were also clearly E.A. Conway employees. It would thus appear that the trial court should have ordered their sequestration. Although it is difficult to ascertain from the record which of the defendants' witnesses were actually present in the courtroom during any other witness's testimony, it does appear that certain *770 of defendants' witnesses may have been present in the courtroom prior to their own testimony.
A primary purpose underlying the rule of sequestration is to prevent the fact witnesses from being influenced by prior testimony. Hopkins v. Department of Highways, 350 So.2d 1271 (La.App. 3rd Cir. 1977). Accordingly, where an individual witness violates the rule of sequestration, such will be considered harmless error where there is no evidence that the violation of sequestration has altered or influenced that witness's testimony. Henderson v. Eastman Whipstock Pilot, Inc., 524 So.2d 850 (La.App. 3rd Cir.1988), writ denied, 525 So.2d 1049 (La.1988); Barnhill v. Continental Dredging Company, 522 So.2d 146 (La.App. 3rd Cir.1988), writ denied, 526 So.2d 795 (La.1988). The same rationale would appear applicable under the circumstances of the instant case, where the trial court erroneously exempted defendants' witnesses from the rule of sequestration.
The plaintiffs have made no specific allegations of prejudice resulting from the failure to order sequestration of defendants' witnesses, nor do we perceive any. On the contrary, it would appear from the record that no prejudice occurred. Here, the defendants' physician witnesses had no independent recollection of Mr. Iseah. In light of the nature of emergency medicine, which deals with a high volume of patients, and the number of years between the treatments of Mr. Iseah and trial, the failure to remember an individual patient is not surprising. The resultant effect was that each physician was testifying, factually, based on the medical records he had personally made at the time of Mr. Iseah's treatments. In other words, each physician's factual testimony was based on what he had entered in Mr. Iseah's records. There was little danger that one physician's testimony would influence another as each physician's factual testimony was, in effect, entered not at trial, but rather at the time Mr. Iseah had sought treatment.
Further, as Mr. Iseah's entire medical records had to be considered to render a medical opinion, each physician had, prior to trial, considered the factual testimony of his fellow physicians. There thus appears to have been no influence on each witness's testimony by his having heard the trial testimony of the other physicians.
We see no prejudice to the plaintiffs under these circumstances and none has been asserted.

EVIDENCE
Plaintiffs assign error in two evidentiary rulings of the trial court. The first occurred during plaintiffs' cross-examination of Dr. Roy G. Clay, Jr., assistant dean for E.A. Conway services at LSU Medical Center as well as the director of surgical services at E.A. Conway Hospital. Dr. Clay was presented with plaintiffs' Exhibit 6, the medical bills for Mr. Iseah's stays at E.A. Conway. The bill presented to Dr. Clay showed a charge for January 18, 1986, a date on which Mr. Iseah was apparently not in the hospital. Dr. Clay explained that, after a thorough search of all medical records, there was no evidence that Mr. Iseah had been in the hospital on January 18, 1986. It was therefore Dr. Clay's opinion that the medical bill contained a typographical error and actually was a charge for treatment given to Mr. Iseah on January 28, 1986, a day on which it was clearly established that Mr. Iseah was at E.A. Conway. After significant questioning of Dr. Clay regarding the medical bill and whether Mr. Iseah may have been at E.A. Conway on January 18, the trial court asked the plaintiffs to move on to another topic, that it would hear nothing further on the issue of the January 18 entry on Mr. Iseah's medical bill. The plaintiffs now claim that they were thereby prohibited from showing malpractice was committed on January 18, 1986.
Plaintiffs presented no other evidence, rather than the medical bill itself, which would support a finding that Mr. Iseah was at the hospital on January 18. None of defendants' physicians, other than Dr. Clay, were even questioned regarding the January 18 date. Nor did Mr. Iseah's relatives *771 testify that Mr. Iseah had been at E.A. Conway on January 18.
Clearly, the trial court was apprised of and thoroughly considered plaintiffs' position. The trial court committed no error in limiting plaintiffs' questioning of Dr. Clay on this issue.
Plaintiffs' remaining evidentiary assignment of error concerns the testimony of Dr. Charles D. Blackmon, defendants' expert in emergency medicine. Dr. Blackmon's testimony was dependent upon notes he had made after reviewing Mr. Iseah's medical records. Plaintiffs argue that they should have been provided with a copy of these notes. The record clearly shows that the plaintiffs were provided with a copy of Dr. Blackmon's notes prior to cross-examination. There is accordingly no basis for this assignment of error.

LIABILITY
Plaintiffs' remaining assignments of error all concern the trial court's finding that there was no liability on the part of the defendants. Although plaintiffs have divided this issue into various assignments of error, for ease of discussion, we will consider all of these related arguments together. Plaintiffs' basic contention is that defendants were negligent in failing to diagnose Mr. Iseah's SBE on January 10 and January 21, 1986.
The liability of E.A. Conway Memorial Hospital and the State of Louisiana, through the Department of Health and Human Resources, is predicated on a finding of liability on the part of their employee physicians. A physician's employers are vicariously liable for the physician's breach of his professional duty. Allen v. State, 535 So.2d 903 (La.App. 2d Cir.1988), writ denied, 536 So.2d 1201 (La.1988); Malone v. State, Department of Health & Human Resources, Office of Hospitals, 569 So.2d 1098 (La.App. 3rd Cir.1990).
Our inquiry must therefore focus on the actions of Drs. Daniel Wayne Twitchell and Jose Singson, the physicians who treated Mr. Iseah in the emergency room at E.A. Conway on January 10 and January 21, 1986, respectively. A plaintiff in a medical malpractice action has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances;
(2) That the defendant-physician either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care, the plaintiff suffered injuries that would not otherwise have been incurred.
LSA-R.S. 9:2794; Broadway v. St. Paul Insurance Company, 582 So.2d 1368 (La. App. 2d Cir.1991); Maxwell v. Soileau, 561 So.2d 1378 (La.App. 2d Cir.1990), writs denied, 567 So.2d 1123, 1124 (La.1990).
In a medical malpractice action against a specialist, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the involved medical specialty and is not restricted to proof of the standards of care and skill within the defendants' community or locality. LSA-R.S. 9:2794; Stein v. Insurance Corporation of America, 566 So.2d 1114 (La.App. 2d Cir.1990), writ denied, 569 So.2d 984 (La.1990); Douzart v. Jones, 528 So.2d 602 (La.App. 2d Cir.1988).
Plaintiffs initially argue that Drs. Twitchell and Singson were erroneously held to the standard of care of general physicians rather than to the national standard of a specialist in emergency medicine. Neither Dr. Twitchell nor Dr. Singson is board certified in emergency medicine, nor did either claim to be an expert in emergency medicine.
A reading of the trial court's reasons for judgment in the instant case seems to support plaintiffs' argument that the trial court applied the locality standard of general physicians, though that point is not *772 entirely clear. The trial court specifically found that "[t]he actions of the emergency room physicians at E.A. Conway Memorial Hospital were in accord with the general standard of care prevailing in the emergency rooms in this area...."
Generally, it has been held that where a physician limits his practice to a specialized field and holds himself out as being so limited, he will be held to the standard of care of a specialist and not entitled to the application of the locality rule. Parmelee v. Kline, 579 So.2d 1008 (La.App. 5th Cir.1991), writ denied, 586 So.2d 564 (La.1991); Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3rd Cir.1987), writs denied, 522 So.2d 562, 563 (La.1988).
In the instant case, both Drs. Twitchell and Singson had practiced emergency medicine exclusively for four and six years, respectively, prior to Mr. Iseah's death. Clearly, by restricting their practice to the E.A. Conway Hospital emergency room, each had held himself out as limiting his practice to emergency medicine. Further, we note that the jurisprudence has repeatedly, although perhaps implicitly, held that emergency room physicians are to be held to the standard of care of specialists in emergency care and therefore the locality rule has not been applied. See Smith v. State Department of Health and Human Resources Administration, 523 So.2d 815 (La.1988); Battles v. Aderhold, 430 So.2d 307 (La.App. 3rd Cir.1983). But see Reid v. North Caddo Memorial Hospital, 528 So.2d 653 (La.App.2d Cir.1988), where the locality rule had been applied to emergency room physicians by the trial court, but this court specifically noted that the propriety of the application of that rule was undisputed and accordingly was not considered on appeal.
Notwithstanding that the trial court may have mistakenly applied the locality rule, we find that ultimately no error was committed. Neither of the plaintiffs' two expert witnesses was an emergency room physician. Drs. Stephen Senecoff and Frank A. Finnerty, Jr. are both board certified in internal medicine and board qualified in cardiology. Dr. Senecoff has not been an emergency room physician for the past 28 years, and Dr. Finnerty has never served as a full-time emergency room physician. Neither of these two physicians could, nor did they attempt to, testify as to the national standard of care for specialists in emergency medicine. The plaintiffs therefore failed to show a difference between the national standard of care of a specialist in emergency medicine and the local standard of care for a general practitioner in an emergency room such as that at E.A. Conway Hospital. Accordingly, we must infer that there is no difference in the standard of care.
We therefore turn to the ultimate issue, whether the trial court erred in holding that the plaintiffs failed to prove liability on the part of the defendants for the failure to diagnose and treat Mr. Iseah's SBE on January 10 and 21, 1986.
A physician is not required to exercise the highest degree of care possible. Rather, his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. The law does not require absolute precision from a physician. Stein v. Insurance Corporation of America, supra; Maxwell v. Soileau, supra. A physician's conduct and professional judgment must be evaluated in terms of the reasonableness under the then existing circumstances and should not be viewed in hindsight and in terms of results or in light of subsequent events. Broadway v. St. Paul Insurance Company, supra; Stein v. Insurance Corporation of America, supra.
In a medical malpractice action, credibility determinations, including the evaluation of and resolution of conflicts in expert testimony, together with the ultimate issue of whether a plaintiff has satisfied his burden of proof are factual issues to be resolved by the trier of fact, which will not be disturbed on appeal in the absence of manifest error. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Maxwell v. Soileau, supra.
It is undisputed that SBE is a very rare disease and one difficult to diagnose. *773 On neither January 10, 1986, nor January 21, 1986, did Mr. Iseah present himself at the emergency room with both of the predominant, externally discoverable symptoms of SBE, a persistent low grade fever which spikes to higher temperatures and a new heart murmur or a change in an existing heart murmur.[1]
On January 10, 1986, Mr. Iseah had a low grade fever with a temperature of 99.6 degrees,[2] but there was no evidence of a heart murmur. Mr. Iseah had a rapid pulse and complained of vomitting over the previous days and admitted to a history of alcohol abuse. Dr. Twitchell noted that the elevated pulse and fever were consistent with delirium tremens. Mr. Iseah also had an elevated white blood cell count, which could be a sign of infection. Dr. Twitchell found no reason to suspect SBE and diagnosed Mr. Iseah as suffering from alcoholic gastritis and probable chronic pancreatitis. All of the defendants' expert physicians testified that they would agree with this diagnosis and none would have suspected SBE from the January 10 symptoms of Mr. Iseah.
On January 21, 1986, Mr. Iseah came to the emergency room with complaints of chest pain and nausea. His temperature was normal and he had no heart murmur. Dr. Singson ordered an electrocardiogram which showed sinus tachycardia, meaning his heart was beating more rapidly than normal, and lowered T waves, indicating that his heart needed more oxygen, common in cases of angina pectoris. Dr. Singson administered nitroglycerine, which appeared to relieve the angina. Again, all of defendants' physician witnesses concurred that this was an appropriate diagnosis and there was no reason to suspect SBE on January 21, 1986.
Plaintiffs' most persuasive argument that malpractice was committed by defendants stems from E.A. Conway Hospital's failure to automatically provide past medical records of patients to its emergency room physicians. Drs. Twitchell and Singson each testified that a review of Mr. Iseah's prior medical records would not have changed their diagnoses.
Dr. Finnerty disagreed. He acknowledged that, when viewed in isolation, there was no negligence committed by Drs. Twitchell and Singson on January 10 and January 21, in their diagnoses, based on Mr. Iseah's presenting symptoms on each date. However, if the emergency room physicians would have reviewed Mr. Iseah's past medical history, Dr. Finnerty concluded that it was more probable than not that a diagnosis of SBE would have been made on January 10 and/or January 21. The diagnosis could have been made, according to Dr. Finnerty, because, with a history of heart disease,[3] considered with Mr. Iseah's fever of October 1985,[4] together with the January 10 fever and the elevated white blood cell count, a sign of infection, SBE should have been suspected.
However, it must be noted that Dr. Finnerty was not an emergency room physician and was thus unable to testify as to the general standard in emergency rooms as to any requirement that prior medical records be considered. The defendants' witnesses, who worked in the emergency rooms at E.A. Conway Hospital, Glenwood Hospital in Monroe, and St. Francis Hospital in Monroe, testified that accepted practice in emergency rooms is that past medical records are available to the emergency room physician only when he requests such *774 records. In order to avoid the delay necessitated by providing medical records on every emergency room patient, clearly an unwarranted and inadvisable delay for a true emergency, E.A. Conway had elected to provide medical records to emergency room physicians only when the physician so requested.
Record evidence indicates that the function of the emergency room and the emergency room physician is to focus on the emergency condition, to provide emergency treatment, and to stabilize the patient's condition as soon as possible. Further, attempting to locate past records often contradicted this purpose. Nevertheless, past medical records were automatically available and reviewed whenever the patient was sent from the emergency room to a clinic or other section of the hospital for either further tests or treatment. Follow-up care is provided by other physicians either after the patient is hospitalized or after he is scheduled for later, outpatient treatment in one of the hospital clinics. At that subsequent time, his prior medical records will be reviewed.
In the instant case, on January 10, 1986, Mr. Iseah was scheduled for x-rays and an appointment was made for him in the surgery clinic. Mr. Iseah failed to return for these appointments. Following his January 21, 1986 emergency room treatment, Mr. Iseah was scheduled to return for an electrocardiogram. Again Mr. Iseah failed to appear for his appointment. The failure to examine Mr. Iseah's medical records therefore stemmed not from any negligence or deviation from the general standard of care in the emergency room, but from Mr. Iseah's failure to return to the clinic for his scheduled tests.
Finally, we note that, as found by the trial court, it cannot be determined from the record when SBE developed in Mr. Iseah. The testimony revealed that SBE could have developed anywhere from several days to weeks or even months before his final January 28, 1986 hospitalization. The plaintiffs' two experts believed that Mr. Iseah was suffering from SBE as early as his October 1985 hospitalization. The defendants' experts were of the opinion that the SBE infected Mr. Iseah during the interval between his January 21 emergency room visit when he was treated for angina and his final treatment at E.A. Conway beginning on January 28. The most detailed testimony regarding the onset of SBE came from Dr. Ronald P. Koepke, the defendants' expert in cardiology, who testified that it can be several days to several months between the onset of the disease and its manifestation. Dr. Koepke testified that the average or median period is one week, or the exact time between Mr. Iseah's final hospitalization and the immediately preceding one on January 21, 1986.
In light of this testimony, we find no manifest error in the trial court's factual conclusion that plaintiffs failed to prove Mr. Iseah had SBE on either January 10 or January 21, 1986. Of course, there cannot have been negligence in the failure to diagnose a disease which had not yet manifested itself.
In conclusion, we find ample support for the trial court's factual conclusions and its ultimate finding that plaintiffs failed in their burden of proving any medical malpractice liability on behalf of the defendants. Accordingly, the judgment appealed from is affirmed at appellants' cost.
AFFIRMED.

APPLICATION FOR REHEARING
Before MARVIN, SEXTON, LINDSAY, HIGHTOWER and BROWN, JJ.
Rehearing denied.
NOTES
[1] Plaintiffs argue that any murmur should be considered a symptom of SBE, citing several medical textbooks entered into evidence. We note that these textbooks were all at least six years old and possibly outdated at the time of Mr. Iseah's death. Additionally, plaintiffs' expert, Dr. Finnerty, himself, testified that a changed or a new murmur was required for a diagnosis of SBE. The trial court factually found that only a new or a change in an existing murmur was symptomatic of SBE; that conclusion is not clearly wrong.
[2] There was testimony from several physicians that a temperature of 99.6 degrees should not even be classified as a fever.
[3] Damaged heart valves are at greater risk to be attacked by the SBE bacteria.
[4] We note that Mr. Iseah's temperature at that time was 99.2 degrees, which would not have been classified as a fever by several of the physician witnesses.