704 So.2d 969 (1997)
Edna Ruth FERRELL, et ux., Plaintiff-Appellant,
v.
MINDEN FAMILY CARE CENTER, Defendant-Appellee.
No. 30088-CA.
Court of Appeal of Louisiana, Second Circuit.
December 19, 1997.
Rehearing Denied January 15, 1998.
*971 J. Patrick Hennessy, Shreveport, for Plaintiff-Appellant.
Gordon E. Rountree, Shreveport, for Defendant-Appellee Minden Family Care Center.
Kim Loraine Purdy-Thomas, Shreveport, for Defendant-Appellee Dr. Michael L. Pistorius.
Lawrence W. Pettiette, Jr., Shreveport, for Defendant-Appellee Dr. F. Joseph Blell.
Before WILLIAMS and GASKINS, JJ., and PRICE, J. Pro Tem.
WILLIAMS, Judge.
The plaintiffs, Edna and Carl Ferrell, appeal the trial court's judgment in favor of the defendants, Dr. Michael Pistorius, Dr. Farouk Blell, the Minden Family Care Center and their insurers. The trial judge directed a verdict in favor of Dr. Blell and the jury found that the defendants did not breach the standard of care during their emergency treatment of the plaintiffs' minor child. For the following reasons, we affirm.

FACTS
On September 27, 1991, the plaintiff, Edna Ferrell, brought her 16-year-old daughter, Susan Ferrell, to the Minden Family Care Center ("MFCC") for her weekly allergy shot. Susan was a patient of Dr. John Fleming, the owner of MFCC. She suffered from severe allergies and asthma, took various medications and had been taking asthma shots for three years with only occasional minor allergic reactions. After receiving her injection, Susan left the clinic. Once outside, she complained that she was having difficulty breathing. With the assistance of her mother, Susan returned to MFCC, where she went into anaphylactic shock. Anaphylaxis is a severe allergic reaction which causes the respiratory tract tissue to swell and the bronchial tubes to spasm or contract, and thereby prevents normal air flow. Susan stopped breathing and her skin began turning blue.
The nurses called for an ambulance and summoned Dr. Pistorius. Susan then went into complete cardiopulmonary arrest. Dr. Pistorius began CPR with mouth-to-mouth resuscitation and called for an epinephrine injection and the "crash cart" containing a laryngoscope and an endotracheal tube. Susan began to vomit, her mouth and throat were cleared and resuscitation continued. Dr. Blell, a urologist renting office space in the building, was called to aid in the resuscitation efforts. Apparently, Dr. Pistorius inserted the endotracheal tube into Susan's throat, although he later stated he did not specifically recall placing the tube. Both he and Dr. Blell stated that they heard breath *972 sounds, indicating that the tube was placed into the trachea.
Susan was ventilated with an Ambu-bag connected to the breathing tube. However, the doctors experienced resistance while bagging, and were concerned that the patient was not ventilating effectively, due to bronchospasms caused by her anaphylactic reaction or to vomit blocking the tube. Dr. Pistorius extubated the patient shortly before the emergency technicians entered the room. The paramedic used a vacuum device to suction the vomitus material from her throat and then inserted a second endotracheal tube. The paramedic, David Divelbiss, heard breath sounds indicating a proper air exchange while ventilating the patient.
However, Susan was in cardiac arrest and thus her body was not circulating the necessary oxygen to her brain. Electrical shock was twice administered and Susan's heartbeat and pulse were restored approximately eight to ten minutes after her collapse. Susan was transported by ambulance to Highland Hospital in Shreveport, Louisiana. After tests confirmed that her brain activity had ceased due to a lack of oxygen, plaintiffs chose to remove their daughter from the life-support systems. Susan died on September 30, 1991.
Plaintiffs filed a medical malpractice complaint, contending that their daughter died as a result of the negligent care performed by MFCC, Dr. Fleming, Dr. Pistorius and Dr. Blell. A medical review panel was convened. The panel members issued an opinion, finding that these physicians had not breached the standard of care. Plaintiffs subsequently filed this action for damages against the defendants and their insurers.
At the close of evidence, the trial judge directed a verdict in favor of Dr. Blell, finding that he was immune from liability under LSA-R.S. 37:1731. Subsequently, the jury found that MFCC and Dr. Pistorius had not breached the standard of care and were not liable for plaintiffs' injuries.[1] Plaintiffs appeal.

DISCUSSION
In a malpractice action based on the negligence of a physician licensed to practice in Louisiana, where the defendant practices in a particular specialty and the alleged acts of medical negligence raise issues peculiar to that specialty, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within that medical specialty. LSA-R.S. 9:2794(A); Roberts v. Cox, 28,094 (La.App.2d Cir. 2/28/96), 669 So.2d 633; Simmons v. West, 29,633 (La.App.2d Cir. 6/18/97), 697 So.2d 688.
In a medical malpractice action against a physician, the plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Roberts v. Cox, supra. Credibility determinations, including the evaluation of expert testimony, together with the ultimate issue of whether a plaintiff has satisfied his burden of proof are factual issues to be resolved by the trier of fact and will not be disturbed on appeal in the absence of manifest error. Iseah v. E.A. Conway Memorial Hospital, 591 So.2d 767 (La.App. 2d Cir.1991), writ denied, 595 So.2d 657 (La.1992); Martin v. East Jefferson General Hospital, supra; Roberts v. Cox, supra
A physician is not required to exercise the highest degree of care possible. Rather, his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. The law does not require absolute precision from a physician. A physician's conduct and professional judgment must be evaluated in terms of the reasonableness under the existing circumstances and should not be viewed in hindsight and in terms of results or in light of subsequent events. Iseah, supra. The mere fact that an injury occurred does not raise a presumption that the physician was negligent. LSA-R.S. 9:2794(C).
*973 Expert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions to determine whether the defendant doctor possessed the requisite degree of skill or knowledge, or failed to exercise reasonable care and diligence. Hughes v. Bailey, 29,314 (La.App.2d Cir. 4/2/97), 691 So.2d 359; Martin v. East Jefferson General Hospital, supra.
A reviewing court will give great deference to the findings of fact when medical experts express different views, judgments, and opinions on whether the standard of care was met in any given case. The reviewing court must give great weight to the factual findings of the trier of fact. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, the appellate court should not disturb this factual finding in the absence of manifest error. Rosell v. ESCO, 549 So.2d 840 (La. 1989); Hughes, supra.
Here, plaintiffs argue that a reasonable factfinder could not credit Dr. Pistorius' trial testimony concerning the emergency situation because his description of certain matters was inconsistent with previous deposition statements. In his deposition, Dr. Pistorius estimated that the first breathing tube remained in place for three minutes, that four to five minutes passed from the time Susan returned to the clinic until that tube was removed, and that the second tube was inserted two minutes later by the paramedic.
However, at trial Dr. Pistorius testified that his earlier estimates were incorrect and that the actual total time between the patient's collapse and insertion of the second tube was approximately three minutes. The Bayou Ambulance records introduced into evidence reflect that emergency personnel received the call from the clinic at 4:23 p.m. (16:23), that they arrived at the scene two minutes later at 4:25 p.m. (16:25), and that the paramedics first activated the heart monitor at 4:26 p.m. (16:26), a period of three and one-half minutes.
Divelbiss, the paramedic, testified in his deposition that because the office clock and the monitor were not synchronized, the actual time span before the monitor was activated "could have been" five or six minutes. However, such a discrepancy appears unlikely in light of the ambulance arrival time at 4:25 p.m. In any event, Gary Jones, the other emergency technician, testified at trial that Divelbiss was performing the intubation before Jones connected the monitor to the patient. The jury was able to consider this evidence in weighing Dr. Pistorius' differing statements and in assessing the accuracy of his trial testimony.
Plaintiffs contend that the jury could not properly give credibility to Dr. Pistorius' trial testimony concerning the length of time needed to establish the patient's airway because Highland Hospital records contradict his statements. The record shows that after Susan was stabilized for transport, Dr. Pistorius spoke with Dr. Ronald Hubbard and Dr. Robert Taylor of Highland Hospital.
In his consult report, Dr. Taylor stated that Dr. Pistorius had estimated that the patient was without a functional airway for ten minutes. Dr. Hubbard reported in his dictated discharge summary that after the patient went into cardiac arrest, it took ten minutes to establish an adequate airway. At trial, Dr. Hubbard testified that he did not recall from whom he received the timing information, but said that he reviewed Dr. Taylor's note at the time.
At trial, Dr. Pistorius denied that he had stated to either Dr. Taylor or Dr. Hubbard that it had taken ten minutes to establish an airway. Dr. Pistorius testified that he had tried to explain to Dr. Hubbard over the telephone that the patient had not received oxygen to her brain for at least ten minutes. Dr. Pistorius stated that he did not discuss the airway when he later spoke personally with Dr. Taylor at Highland. The jury was in a position to weigh this contradiction and to consider the circumstances under which *974 Dr. Pistorius made his statement, and the reliability of the recollection of the other physicians. Based upon this record, we cannot say the jury's assessment of the testimony and evidence was unreasonable. The plaintiffs' argument lacks merit.
In support of their contention that the endotracheal tube was improperly placed in Susan's esophagus, the plaintiffs presented testimony by Dr. David Tarlow, who was accepted as an expert in cardiac life support procedure. Dr. Tarlow testified that there were several indicators present tending to show that the breathing tube was most likely improperly placed in the patient's esophagus. These indications include diminished breath sounds, difficulty in ventilating the patient, a ruptured stomach lining and the failure of the patient's skin to regain a pink hue. However, Dr. Tarlow acknowledged that diminished breath sounds do not necessarily mean that the tube was in the esophagus, and that reduced breathing may be caused by a bronchospasm, which restricts the bronchial tubes.
Dr. Tarlow opined that Dr. Pistorius and Dr. Blell violated the standard of care by failing to recognize within one minute that the breathing tube was placed in the esophagus, rather than the trachea, and in not obtaining an airway in a timely manner. Dr. Tarlow testified that Susan would not have suffered brain death if the improperly placed tube had been removed and replaced within one minute.
Dr. Michael Fleming, board certified in family practice medicine, was a member of the medical review panel.[2] In his deposition, Dr. Fleming testified that in almost every emergent tracheal intubation, even when correctly done, if a patient vomits, stomach contents will enter the lungs. Dr. Fleming stated that because Susan vomited before the first breathing tube was placed, vomitus could have already entered and obstructed the trachea. In contrast to Dr. Tarlow's opinion, Dr. Fleming opined that the resistance felt during ventilation with the bag is more consistent with tracheal intubation. He stated that bagging would be more difficult when attempting to push air into the lungs than into the stomach, which is an open system that can hold a large amount of air.
Based on the x-ray report, Dr. Fleming believed it was most likely that Susan's stomach laceration occurred between September 28-29, 1991, when the rupture first appeared on the x-ray film, and not on the day of the incident. Dr. Fleming stated that he would not expect the patient's skin to regain a pink hue in this type of case, because the patient had sustained both respiratory and cardiac arrest. Thus, getting air into the lungs is only one part of the equation, and one must also regain a heartbeat to circulate blood and carry oxygen to the brain and skin tissue. Dr. Fleming opined that Dr. Pistorius satisfied the standard of care.
The other two members of the medical review panel, Dr. Michael Harper and Dr. David Henry, also testified that in their opinion Dr. Pistorius met the standard of care in his management of the emergency. Dr. Harper stated that Dr. Pistorius properly began CPR immediately, with mouth-to-mouth resuscitation and chest compressions. Dr. Harper opined that the evidence indicated Susan was intubated by the paramedic within four minutes of her cardiac arrest, and that it was most likely brain damage did not occur during this period, but occurred after the second intubation, while the paramedic attempted to regain a heart rhythm, which was not obtained until eight to ten minutes after her cardiac arrest. Dr. Henry testified that he believed Susan sustained brain damage after the second intubation, because she did not have a heartbeat or circulation.
Dr. Blell testified that he was asked to assist in an emergency. He stated his belief that the endotracheal tube was placed by Dr. Pistorius, who asked Dr. Blell to ventilate the patient. Dr. Blell testified that he heard breath sounds and wheezing, which indicated that the tube was in the trachea, and stated that it was difficult to push air into the lungs. Neither he nor Dr. Pistorius were pleased with the amount of air getting to the patient's lungs and the tube was removed. Dr. *975 Blell testified that vomit was obstructing the tube and that the patient was being ventilated with a bag and mask when the emergency technicians arrived.
Dr. Pistorius testified that he visualized the patient's vocal chords and assumed that he inserted the endotracheal tube. Dr. Pistorius stated that he and Dr. Blell both heard breath sounds and were satisfied that the tube was in the trachea. Dr. Pistorius recalled that there was resistance from the bagging and he believed it was caused by the patient's intense bronchospasms. He testified that he was concerned by the inadequate ventilation and so he removed the tube to clear out the airway, and at that point the paramedics arrived.
In the present case, the parties presented competing interpretations of the evidence. The jury heard the conflicting testimony and weighed the credibility of the witnesses. Based upon the evidence in the record, the jury could have reasonably concluded that Dr. Pistorius properly inserted into the patient's trachea the initial endotracheal tube, which did not function effectively due to an obstruction. After reviewing the record, we cannot say the jury was clearly wrong in its evaluation of the expert testimony or in its ultimate finding that Dr. Pistorius was not negligent in his treatment of Susan Ferrell during the emergency situation. The assignment of error lacks merit.

Jury Charges
The plaintiffs contend the trial court erred in its instructions to the jury. Plaintiffs argue the jury was not properly instructed concerning the applicable standard of care and the plaintiffs' burden of proving causation.
The trial court is not obligated to give the precise instructions submitted by the parties, but those that are given must correctly reflect the relevant issues and law. LSA-C.C.P. art. 1793; Rowsey v. Jones, 26,823 (La.App. 2d Cir. 5/10/95), 655 So.2d 560. The adequacy of jury instructions must be determined on the basis of the instruction as a whole. On review, an appellate court must exercise restraint, and set aside the verdict only in cases where the instructions misled the jury to such an extent as to prevent it from doing justice. Rowsey v. Jones, supra.
In the present case, plaintiffs objected to the jury instruction which included language referring to the locality standard of care, despite the applicability of a national standard. The trial judge instructed the jury that plaintiffs must prove by a preponderance of evidence the degree of care ordinarily exercised by physicians practicing in a similar community and under similar circumstances, and where the physician practices in a particular specialty, he must satisfy the standard of care ordinarily exercised by physicians practicing in that specialty.
The trial court's instruction conforms with the language of LSA-R.S. 9:2794 regarding the standard of care for specialists. At trial, the jury heard Dr. Tarlow testify that the standard of care for emergency airway management was the same for all physicians with advanced cardiac life support (ACLS) training. The jury was informed that Dr. Pistorius was ACLS certified. In addition, the trial court instructed the jury that the duty of a physician in treating a patient is to exercise the degree of care and skill which is ordinarily exercised by physicians under similar circumstances. Thus, the instructions taken as a whole allowed the jury to consider whether Dr. Pistorius met the standard of care for a specialist performing the life support procedure. We cannot say the trial court's instruction misled the jury or caused an injustice.
Plaintiffs assert that the trial court erred in instructing the jury that an expert's opinion as to matters within his field is entitled to greater weight than the opinion on the same subject by a specialist in another field. They contend that this language might have left the jury with the impression that a family practice specialist's opinion should be given greater weight than that of Dr. Tarlow, despite the uniform ACLS standard. However, as we previously noted, the jury heard testimony concerning the ACLS standard, and the trial court further instructed the jury that it should consider each expert opinion and give it such weight as the jury believed *976 the opinion deserved. Thus, the record does not support the plaintiffs' contention and we cannot say the trial court erred in delivering the challenged instruction.
The plaintiffs complain that the trial court erred in referring to death in its jury instruction concerning causation and in refusing to use language requested by plaintiffs. The court's instruction stated in pertinent part:
... [P]laintiffs must establish that Dr. Pistorius' negligence caused or contributed to the patient's death and additionally that his negligence increased the risk of harm by being a substantial factor in causing a harmful result. In a case like this, however, where the patient has died, the plaintiffs do not need to prove that the patient would have survived if she had been treated properly, or that the physician caused the patient's death. Rather, the plaintiffs need only prove that the patient had a chance of survival and that her chance of survival was lost as a result of the physician's negligence.
The trial court is not obligated to use the precise instructions submitted by a party. Considering the jury charge as a whole, we conclude that it correctly and adequately states the law relevant to causation in a medical malpractice case. The assignment of error lacks merit.

Good Samaritan Law
The plaintiffs contend the trial court erred in directing a verdict dismissing their claims against Dr. Blell and in interpreting LSA-R.S. 37:1731, the Good Samaritan statute. Plaintiffs argue that MFCC is a hospital and thus Dr. Blell is not entitled to immunity from suit.
LSA-R.S. 37:1731 provides that any physician or surgeon licensed to practice medicine in Louisiana, "who in good faith gratuitously renders emergency care or services at the scene of an emergency, except in a public or private hospital of this state, to a person or persons in need thereof," shall not be liable for any civil damages as a result of rendering such care or services.
At trial, the parties stipulated that Dr. Blell rendered gratuitous services at the scene of an emergency. In support of their argument that MFCC should be considered a hospital, plaintiffs cite LSA-R.S. 40:1299.41, which defines hospital to include any physician's office or clinic containing facilities for the treatment of human illnesses.
However, R.S. 37:1731 does not contain such a definition, but rather expressly states that its provisions extend to physicians who render gratuitous emergency care, "except in a public or private hospital of this state." Louisiana law requires that a facility obtain a license from the Department of Health and Human Resources in order to operate as a hospital. LSA-R.S. 40:2103. Trial testimony established that MFCC has never been licensed or inspected as a hospital by the state of Louisiana.
Pursuant to the plain language of the Good Samaritan Law, we conclude that the trial court was not clearly wrong in finding that the MFCC is not a hospital of this state. Consequently, Dr. Blell is protected from liability for civil damage claims arising from the gratuitous emergency care he rendered to Susan Ferrell. Therefore, the trial court did not err in granting Dr. Blell's motion for a directed verdict. The assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, the trial court's judgment is affirmed. Costs of this appeal are assessed to the appellants, Edna and Carl Ferrell.
AFFIRMED.
APPLICATION FOR REHEARING
Before MARVIN, C.J., NORRIS, WILLIAMS and GASKINS, JJ., and PRICE, J. Pro Tem.
Rehearing denied.
NOTES
[1] Plaintiffs also filed a post trial "Motion For Judgment Notwithstanding the Verdict, or in the Alternative, For a New Trial." The trial court denied the motion.
[2] Dr. Michael Fleming testified that he is not related to Dr. John Fleming, who was the treating physician of the deceased, Susan Ferrell, and the owner of MFCC.