669 So.2d 633 (1996)
David A. ROBERTS, et al., Plaintiffs-Appellants,
v.
Dr. Jack COX, et al., Defendants-Appellees.
No. 28094-CA.
Court of Appeal of Louisiana, Second Circuit.
February 28, 1996.
*635 Bruscato, Tramontana & Underwood by Anthony J. Bruscato, Monroe, for Appellants.
Dollar, Price, Noah & Laird by Elmer G. Noah II, Monroe, Hayes, Harkey, Smith & Cascio by Haynes L. Harkey, Jr., Monroe, for Appellees.
Before MARVIN, SEXTON and WILLIAMS, JJ.
WILLIAMS, Judge.
In this medical malpractice action, the plaintiffs, David and Carla Roberts, appeal a jury verdict finding that the defendants, Dr. Jack Cox and Lincoln General Hospital, were not negligent in their treatment of the Roberts' son. For the following reasons, we affirm.

FACTS
David and Carla Roberts ("Roberts") are the parents of Austin, who was born on August 16, 1988. Since birth, the child suffered from numerous ear infections and sinus problems. As a result, Dr. David McGehee, Austin's pediatrician, recommended surgery and referred him to Dr. C. Lawrence Neal, an ear, nose and throat specialist in Ruston. Dr. Neal met with the Roberts and discussed the surgical procedure he would perform.
On the morning of April 5, 1990, the Roberts brought Austin, who was then nineteen months old, to Lincoln General Hospital *636 ("Lincoln") for out-patient surgery. Nurse Donna Fuller received the patient in the unit, performed a pre-operative nursing evaluation and gave David Roberts a consent form to sign. The form listed the possible risks of surgery, including anesthesia, and described the procedure as an incision of tympanic membrane, removal of middle ear fluid, insertion of ventilation tube, removal of adenoid tissue and clearing of maxillary sinuses by needle puncture. The Roberts stated that the nurse did not discuss or explain the risks associated with anesthesia. David Roberts said he did not read the consent form because he knew that it had to be signed before surgery could be performed. Shortly after 8:00 a.m., Dr. Jack Cox, the anesthesiologist, met briefly with the Roberts and asked if anyone in their family had experienced a problem with anesthesia, but did not discuss any potential risks. Austin was then taken to the operating room and put to sleep with oxygen, nitrous oxide and halothane.
Dr. Neal, Dr. Cox, Betty Jo Fitzgerald, the circulating nurse, and Gayle Smith, the scrub nurse, were present in the operating room. Dr. Cox attempted to insert an intravenous ("IV") line into four different locations, Austin's left hand and elbow and his right hand and elbow, without success. Dr. Cox and Dr. Neal discussed the inability to insert the IV line. Because the procedure was expected to be brief, with little blood loss, they mutually decided to proceed with the surgery without an IV line in place. Dr. Cox then administered 30 milligrams of succinylcholine, a drug that paralyzes the patient's muscles and allows insertion of an endotracheal tube, through which the anesthesiologist ventilates the patient during surgery. Dr. Cox inserted and secured the tube, then rotated the operating table so that Austin's head was at Dr. Neal's position.
Dr. Neal turned the child's head to the left in order to look into the right ear. At that point, approximately 8:40 a.m., Austin's pulse slowed from 140 beats per minute to 40 beats, and then he suffered complete cardiac arrest. A Code was called, the endotracheal tube was removed and replaced to make sure it was in the right position and Dr. Neal began CPR. Dr. Butler, Dr. McGehee and a nurse anesthetist, Walter Kennedy, responded to provide assistance. Epinephrine and Atropine were given through the tube. Dr. Butler placed an IV in the saphenous vein of the child's right ankle, but this did not work properly. At 8:56 a.m., Dr. McGehee successfully started an IV in Austin's jugular vein and gave him additional medication. Austin's heart rate was restored at 9:05 a.m., approximately 25 minutes after his heart stopped beating. He was transferred to the intensive care unit, where he remained for three days. Initially, Dr. Cox and Dr. Neal theorized that the cardiac arrest was caused by a vagal reflex response. They thought that when Dr. Neal turned Austin's head, the endotracheal tube moved and stimulated the vagus nerve, causing the heart to stop.
Prior to his cardiac arrest, Austin was able to walk, run and speak in simple sentences. After his discharge from the hospital, several weeks passed before Austin resumed walking, talking and eating as he had previously. In April 1991, Austin underwent the operation that had been attempted one year earlier. Anesthesia was administered and the procedure was performed without incident. In September 1992, Austin was seen by Dr. Bruce Everist, who reported that Austin was possibly suffering from muscular dystrophy. Dr. Everist recommended testing, and a muscle biopsy was performed at Children's Hospital in New Orleans. The pathology report confirmed muscular dystrophy of the Duchenne or Becker type. In 1994, Dr. Joseph Sheller examined Austin and diagnosed the child as suffering from Becker's muscular dystrophy.
In April 1991, the Roberts filed a complaint against defendants, Lincoln General Hospital, Dr. Cox and their respective liability insurers. The Roberts requested the formation of a medical review panel. The complaint alleged that Dr. Cox and hospital employees failed to follow accepted medical standards in their treatment of Austin. In December 1992, the medical review panel found that the defendants were not negligent. The Roberts then filed a petition individually and on behalf of their minor son, alleging that the defendants' medical treatment of Austin was negligent. After a two *637 and one-half week jury trial, the jury rendered a verdict finding that the defendants were not negligent in their treatment of Austin Roberts. The trial court signed the final judgment in accordance with the jury's verdict. The Roberts appealed.

DISCUSSION

Assignment of Error No. 1: Causation
The Roberts contend the jury was clearly wrong in finding that Dr. Cox was not negligent in his treatment of Austin. They argue that the only conclusion a reasonable juror could have reached was that Dr. Cox improperly inserted a breathing tube into the child's esophagus, rather than the trachea, and the resulting lack of oxygen caused Austin's cardiac arrest.
In a malpractice action based on the negligence of a physician licensed to practice in Louisiana, where the defendant practices in a particular specialty and the alleged acts of medical negligence raise issues peculiar to that specialty, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the same medical specialty. The plaintiff must also prove that the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence in applying that skill, and that defendant's failure to exercise this degree of care caused plaintiff to suffer injuries that would not otherwise have occurred. LSA-R.S. 9:2794A; Smith v. Lincoln General Hospital, 27,133 (La.App. 2d Cir. 6/21/95), 658 So.2d 256, writ denied, 95-1808 (La. 10/27/95), 662 So.2d 3. The mere fact that an injury occurred does not raise a presumption that the physician was negligent. R.S. 9:2794C. The jury's findings of fact should not be disturbed on appeal absent manifest error. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Rosell v. ESCO, 549 So.2d 840 (La.1989).
In the present case, the Roberts argue that evidence at trial established that Dr. Cox improperly inserted a breathing tube into Austin's esophagus and caused cardiac arrest. They point to testimony that the child's skin was blue when his heart stopped, indicating hypoxia, or a lack of oxygen, due to esophageal intubation. Walter Kennedy, a nurse anesthetist, testified that he entered Austin's operating room approximately forty seconds after hearing a pulse monitor alarm. Kennedy stated that the child appeared cyanotic, which is a blue tint of the skin indicating a low level of oxygen in the blood. On cross examination, Kennedy testified that he was not present at the time the child suffered cardiac arrest and was not sure how long prior to his entrance Austin had been in arrest. The plaintiffs' expert anesthesiologist, Dr. Scott Holtz of Arizona, testified that if the child was cyanotic, or blue, at the time of cardiac arrest, that would most probably indicate esophageal intubation.
The jury also heard testimony from Dr. Cox, who stated that when Austin's heart stopped and the surgical drapes were removed, the child's skin color looked normal and did not appear blue. Dr. Cox maintains that his observation can be reconciled with Kennedy's testimony that the child appeared cyanotic, because he entered the operating room after cardiac arrest occurred.
The Roberts elicited testimony from Dr. Neal that when the heart rate dropped, he asked Dr. Cox to check the breathing tube and make sure it was in the right place. Dr. Neal stated that in an emergency, his first reaction was to check the patient's airway, and there was no indication that tube placement was improper. Dr. Cox testified that he did not have a problem inserting the breathing tube. He stated that one can determine whether the tube is in the trachea by squeezing the ventilation bag and observing both sides of the patient's chest elevate. Dr. Cox noted that the pulse oximeter, which shows the oxygen saturation level of the blood, and the system of anesthetic and respiratory analysis ("SARA"), which measures the carbon dioxide (CO2) being exhaled, indicate whether the patient is breathing properly. Dr. Cox testified that at the time of arrest, the pulse oximeter showed an oxygen saturation level of 100%, and SARA registered a CO2 reading of 32, which was in the *638 normal range. As a result of these indications, Dr. Cox stated he had no doubt that he properly placed the breathing tube in the child's trachea.
The Roberts also contend that the evidence does not support Dr. Cox's theory that Austin's muscular dystrophy resulted in a hyperkalemic reaction to the muscle relaxant, succinylcholine, which released large amounts of potassium from muscle cells into the bloodstream, causing the child's heart to stop. They contend that this theory fails because medical records do not document an elevated potassium level, the resuscitation took only twenty-five minutes, and Austin suffers from Becker's, and not Duchenne's, muscular dystrophy. The defense anesthesiology expert, Dr. Berry, testified that the record did not contain evidence of an elevated potassium level at the time of Austin's cardiac arrest because none were drawn.
The Roberts' pediatric neurology expert, Dr. Sheller, opined that it was more likely than not that Austin suffers from severe Becker's muscular dystrophy rather than Duchenne's. Dr. Sheller based his opinion on the fact that the results of an immunoflorescence test indicated that Austin's muscle fibers contained the protein dystrophin, which is not present in the muscle tissue of the typical Duchenne's patient. Other factors considered included the child's personality traits and the age of diagnosis. The Roberts assert that the medical literature introduced at trial discussed only the hyperkalemic reaction of patients with Duchenne's muscular dystrophy, and did not refer to the reaction of patients with Becker's muscular dystrophy. However, on cross-examination, Dr. Sheller acknowledged that as a general rule, children with muscular dystrophy have problems with anesthetics. Dr. Berry also testified that patients with all types of muscular dystrophy, including Duchenne's and Becker's, can suffer cardiac arrest when succinylcholine is administered. Thus, Dr. Berry stated that it was not accurate to say that Becker's muscular dystrophy patients are not subject to hyperkalemia.
The Roberts direct this court to the fact that Austin's cardiac arrest lasted 25 minutes, which was not consistent with testimony that the average resuscitation time was 55 minutes after a hyperkalemic reaction. According to Dr. Berry, it takes a minimum of 20 to 30 minutes for the muscle cells to reabsorb potassium. In his opinion, Austin recovered in 25 minutes because of the rapid response of the doctors and the eventual absorption of potassium by the muscle cells.
In light of the testimony in the trial transcript, the jury could reasonably find that Dr. Cox did not negligently insert the endotracheal breathing tube. The record supports the jury's apparent conclusion that the child's cardiac arrest was caused by his hyperkalemic reaction to the muscle relaxant succinylcholine, which was a result of his undiagnosed muscular dystrophy. We cannot say that the jury's choice between conflicting theories was clearly wrong. Therefore, this assignment of error lacks merit.

Assignment of Error No. 2: Negligence
The Roberts argue that the jury erred in finding that Dr. Cox was not negligent in proceeding with this elective surgical procedure after failing to start an IV line. They contend that the applicable standard of care required Dr. Cox to cancel the operation when he could not insert an IV into the patient.
In a medical malpractice action against a physician, the plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. Martin v. East Jefferson General Hospital, supra.
A physician is not held to a standard of absolute precision. Rather, his conduct and judgment are evaluated in terms of reasonableness under then-existing circumstances, not on the basis of hindsight or in light of subsequent events. Iseah v. E.A. Conway Memorial Hospital, 591 So.2d 767 (La.App. 2d Cir.1991), writ denied, 595 So.2d 657 (La.1992). Credibility determinations, including the evaluation of expert testimony, together with the ultimate issue of whether a *639 plaintiff has satisfied his burden of proof are factual issues to be resolved by the trier of fact and will not be disturbed on appeal in the absence of manifest error. Martin v. East Jefferson General Hospital, supra; Iseah v. E.A. Conway, supra.
In the present case, Dr. Cox was unable to start an IV after four attempts. He informed Dr. Neal of the situation and they both agreed to go forward with the procedure. At trial, the Roberts elicited testimony from the expert physicians concerning their personal anesthesia practices and those of local anesthesiologists. Dr. Holtz testified that he tried to start an IV in every pediatric patient, except for those very short cases where no blood loss was expected. Dr. Gates, a Ouachita Parish anesthesiologist and member of the medical review panel, testified that if he is unable to start an IV in a pediatric patient, his practice is to postpone the procedure. He stated that this was also the practice of the other anesthesiologists in Ouachita Parish. However, Dr. Gates acknowledged that his practice was a minority view among all anesthesiologists. He further testified that Dr. Cox and Dr. Neal made a proper medical judgment to go forward, and in his opinion, the decision was not a deviation from the standard of care. The other two members of the medical review panel, Dr. Deas and Dr. Robertson, both agreed that the decision in this case to proceed without an IV line was within the standard of care expected of an anesthesiologist.
The Roberts assert in brief that the practice of the anesthesiologists who testified at trial was to always have an IV line in place when they performed certain pediatric procedures, in contrast to the practice of Dr. Cox here. However, the practices of anesthesiologists in a particular parish do not establish the standard of care. The plaintiff bears the burden of proving through expert testimony that Dr. Cox deviated from the applicable degree of care in his specialty. The expert testimony clearly establishes that this surgical procedure was expected to be of short duration with minimal blood loss. Significantly, all of these anesthesiologists, who were accepted as experts by the trial court, testified that Dr. Cox did not deviate from the standard of care by proceeding without an IV in this type of case.
After reviewing the record and trial transcript, we cannot say that the jury was clearly wrong in its evaluation of the expert testimony or in its ultimate finding that Dr. Cox was not negligent in exercising his medical judgment to proceed without an IV. Therefore, this assignment of error lacks merit.

Assignment of Error No. 3: Informed Consent
The Roberts also contend that the jury was clearly wrong in finding that Dr. Cox was not negligent in failing to obtain their informed consent to the use of anesthesia and to proceed with their son's surgery without an IV in place. They argue that the record reflects an absence of meaningful pre-operative discussions with them concerning the anesthesia risks.
Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved therein, the prospects of success, the risks of failing to undergo any treatment or procedure at all and the risks of any alternate methods of treatment. Smith v. Lincoln General Hospital, supra; Hondroulis v. Schuhmacher, 553 So.2d 398 (La. 1988) (on rehearing). In a medical malpractice action based on inadequate disclosure of risk information by a physician, the patient must provide evidence to establish prima facie the essential elements of the cause of action. The plaintiff bears the burden of proving the existence of a material risk unknown to the patient, a failure to disclose the risk on the part of the physician, that disclosure of the risk would have led a reasonable patient in plaintiff's position to reject the medical procedure or choose a different course of treatment and injury. Smith v. Lincoln General Hospital, supra; Hidding v. Williams, 578 So.2d 1192 (La.App. 5th Cir.1991).
The materiality of a risk depends on the existence and nature of the risk and the likelihood of its occurrence. This requires *640 expert testimony. Hondroulis v. Schuhmacher, supra. Materiality also means that a person in the plaintiff's position would attach significance to the particular risk, and this does not require expert testimony. The physician need not disclose risks that are not reasonably foreseeable. Smith v. Lincoln General Hospital, supra.
In the present case, the record shows that Dr. Neal met with the Roberts prior to surgery, mentioned that anesthesia would be used and described how the procedure would be performed. Nurse Fuller testified that she read the consent form to Austin's parents and specifically underlined with her pen the section of the form that listed anesthesia risks. She then allowed the Roberts additional time to read the form, asked if they had any questions and showed Mr. Roberts where to sign.
Dr. Cox testified that he reviewed Austin's medical chart, which included the signed consent form, before meeting with the parents. Dr. Cox stated that he followed his usual practice of asking the parents if their son had ever been put to sleep before and whether any member of the family had ever had a problem with anesthesia. He told the parents that in the operating room, he would put a mask on Austin's face, let him breathe some anesthesia and then the child would fall asleep. According to Dr. Cox, the Roberts had no questions about the procedure or the anesthesia, and he signed the consent form after talking with the parents. Dr. Cox stated that he assumed the Roberts had read the form with the list of "all these horrible things that can happen," but did not ask them if they wanted to discuss the hazards or risks of anesthesia because he would not "scare my patients to death." The Roberts' anesthesiologist expert, Dr. Holtz, similarly testified that he generally mentions there are risks involved with anesthesia, but does not go into details unless the patient wants to hear more, because he feels it may frighten them.
The record shows that the Roberts were aware that their son would be rendered unconscious, they received a consent form that referenced anesthesia and listed the related risks, but they did not read that section of the form and they did not ask Dr. Cox any questions about the anesthesia. Dr. Berry, Dr. Gates, Dr. Deas and Dr. Robertson all testified that in their opinion informed consent was obtained and that Dr. Cox satisfied the standard of care expected of an anesthesiologist.
The expert medical testimony at trial established that a cardiac arrest caused by the patient's hyperkalemic reaction to succinylcholine is a rare occurrence. The risk encountered in this case involved the adverse reaction of a patient with an undiagnosed sensitivity to a medication. Under the circumstances, the jury could have reasonably concluded that Austin's muscular dystrophy exposed him to the unlikely risk of cardiac arrest, that this risk was not reasonably foreseeable and that the Roberts failed to establish the existence of a material risk which was not disclosed. After reviewing the record, we cannot say that the jury was manifestly erroneous in finding that informed consent was obtained. Therefore, the assigned error lacks merit.

Assignments of Error Nos. 4 & 5: Evidence; Hospital Duty of Care
The Roberts argue that the trial court erred in granting Lincoln's motion to exclude evidence of the anesthesia policies of two other local hospitals. They contend that the evidence should have been admitted because its probative value was not outweighed by the danger of confusion of the issues. The evidence of anesthesia policies in effect at E.A. Conway Memorial Hospital and St. Francis Medical Center was proffered by the Roberts at trial, but was not presented to the jury. We have considered the proffered testimony as part of the record on appeal.
Reviewing courts will defer to a trial court's reasonable decision on a question or matter properly within its discretion. Kem Search, Inc. v. Sheffield, 434 So.2d 1067 (La. 1983). An appellate court has a duty to affirm the trial court's decision absent an error of law or fact. Quick v. Murphy Oil Co., 93-2267 (La.App. 4th Cir. 9/20/94), 643 So.2d 1291, writ denied, 94-2583 (La. 1/6/95), 648 So.2d 923.
*641 Here, the trial court excluded from evidence the policy and procedure manuals of the anesthesiology departments at E.A. Conway Memorial Hospital and St. Francis Medical Center. The Roberts urge that these policies, which require the use of an IV in all elective surgical procedures, were admissible as evidence of the standard of care ordinarily practiced by other hospitals. The implication is that Lincoln's failure to adopt a similar policy represents a deviation from the standard of care owed by a hospital to the patient. However, the Roberts failed to show that the policies of Conway and St. Francis actually represented the standard practice of local hospitals. Dr. Gates, the medical director at St. Francis Hospital, stated that its anesthesia policies might differ from those in effect in Rayville, Louisiana. Lincoln's anesthesia policy differed from that of Conway and St. Francis. Moreover, the responses of Dr. Berry and Dr. Holtz to the trial court's questions showed that the guidelines of their two hospitals, in Virginia and Arizona, did not require anesthesiologists to start an IV before every pediatric surgical procedure. The Roberts made no showing that the proffered evidence was probative of the prevailing standard of care practiced by hospital anesthesiology departments, particularly in light of Dr. Gates' testimony that his group's requirement of having an IV in place before commencing surgery on a child was the "minority" view among anesthesiologists. Accordingly, the trial court properly excluded the evidence. Therefore, this assignment of error lacks merit.
The Roberts argue that the jury was plainly wrong in finding that Lincoln Hospital was not negligent in failing to implement policies requiring that an IV line be inserted before any elective surgery is performed. They contend that Lincoln breached its duty of care owed to Austin and that he suffered injury as a result.
In a medical malpractice action against a hospital, the plaintiff must prove that the defendant owed plaintiff a duty to protect against the risk involved, that defendant breached its duty and that plaintiff's injury was caused by defendant's conduct. Smith v. Dept. Of Health & Human Resources Administration, 523 So.2d 815 (La. 1988). A hospital is bound to exercise the requisite amount of care that the patient's condition may require, and to protect the patient from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached those duties depends upon the facts and circumstances of each case. Smith v. Dept. Of Health & Human Resources Administration, supra; Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974).
In the present case, the parties stipulated that at the time of Austin's surgery, Lincoln Hospital's policies did not address the question of whether an IV should be in place during general anesthesia. Edgar Tuten, the hospital administrator, testified that Lincoln's general policy was to provide patient care in the safest and most effective manner. Dr. Gates, the medical director at St. Francis Hospital, testified that the anesthesia policies in effect there in 1990 provided that an adequate intravenous line "should be present" to administer necessary fluids and medications. Nevertheless, according to Dr. Gates, the decision of whether to proceed with a surgical procedure is a judgment call to be made by the physicians involved. In response to questions by the court, Dr. Berry stated that his hospital's policies did not require that an IV be in place before anesthesia is administered. He pointed out that most guidelines contain a paragraph stating that the judgment of the physician shall be important in their interpretation. Similarly, Dr. Holtz stated that the policies at his hospital contained no such requirement concerning IV placement.
Based on the testimony in the record, the Roberts failed to establish that the policy in effect at Conway and St. Francis hospitals represents the applicable standard of care. We cannot say that the jury was clearly wrong in finding that Lincoln did not breach its duty of care by not implementing anesthesia policies requiring physicians to start an IV before performing an elective surgical procedure. Therefore, this assignment of error lacks merit.
The Roberts' sixth assignment of error addresses the issue of damages. However, *642 our affirmation of the jury's finding that the defendants, Dr. Cox and Lincoln Hospital, were not negligent in their treatment of Austin Roberts pretermits a discussion of the damages issue.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. The costs of this appeal are assessed to the appellants, David and Carla Roberts.
AFFIRMED.