684 So.2d 1093 (1996)
Mary Darlene YUSKA, et al, Plaintiffs-Appellants,
v.
HCA HEALTH SERVICES OF LOUISIANA, INC., dba Highland Hospital, Defendants-Appellees.
No. 28878-CA.
Court of Appeal of Louisiana, Second Circuit.
December 11, 1996.
*1094 Donald R. Miller, Shreveport, for Appellants.
Cook, Yancey, King & Galloway by Samuel W. Caverlee, Shreveport, Blanchard, Walker, O'Quin & Roberts by Lawrence W. Pettiette, Jr., and Paul M. Adkins, Shreveport, for Appellees.
Before HIGHTOWER, WILLIAMS and PEATROSS, JJ.
PEATROSS, Judge.
In this medical malpractice action, the plaintiffs, Mary Darlene Yuska and her son, Corey Roger Yuska, appeal an adverse jury verdict rendered in favor of the defendants, Dr. Daniel J. Moller, Jr. and Dr. Robert Massingill, finding they did not fall below the standard of care required in their treatment of Robert Allen Yuska. For the reasons assigned below, we affirm the judgment of the trial court.

FACTS
On the evening of July 23, 1989, after returning from a weekend fishing trip, Robert Allen Yuska, a 41-year old registered nurse, experienced a painful headache and a droopy left eye. Fearing that her husband was experiencing a stroke or a ruptured brain aneurysm, Mrs. Yuska drove Mr. Yuska to the Highland Hospital emergency room for medical treatment. Hospital records reflect that the two arrived at the emergency room at 9:55 p.m. An emergency room nurse took Mr. Yuska's history and vital statistics.
Defendant, Dr. Robert J. Massingill, who was the emergency room doctor on call, performed a clinical examination of Mr. Yuska. The patient complained of a painful headache behind his left eye, and Dr. Massingill noted that he had a drooping left eye, or ptosis. Dr. Massingill felt Mr. Yuska's symptoms were indicative of a neurological problem involving the third cranial nerve. He prescribed pain medication for Mr. Yuska and ordered an I.V. to be started. He also ordered a CT scan, with and without a contrast medium.
Dr. Massingill attempted to contact Mr. Yuska's personal physician, Dr. Chris Rheams, but, instead, reached Dr. Rheams' practice partner, Dr. Daniel Moller, who was on duty that night. Dr. Massingill informed Dr. Moller of Mr. Yuska's history, symptoms and immediate treatment. Believing that Mr. Yuska could be suffering a ruptured berry aneurysm, Dr. Moller went to the hospital. Mr. Yuska was still in the emergency room when Dr. Moller arrived. After conducting a physical exam and obtaining Mr. Yuska's personal history, Dr. Moller concurred in the CT scan with and without a contrast medium order.
Mr. Yuska was transferred to the radiology department, where Karen Brunner, the radiological technician, met him. After reviewing his past records, Ms. Brunner recognized Mr. Yuska from a previous CT scan she had performed on him with contrast medium. *1095 Ms. Brunner questioned Mr. Yuska about allergies, discussed the previous scan, explained the procedure she would administer and discussed the risks involved. After performing the CT scan without the contrast medium, Ms. Brunner injected Mr. Yuska with Conray 43, the contrast medium. After she injected the initial amount of contrast medium into Mr. Yuska's I.V., he told her that he was having a little difficulty breathing, but that he was fine.
While Ms. Brunner waited to start the hanging drip which contained the remaining contrast medium, Mr. Yuska asked if she would help him sit up. Eventually, Mr. Yuska said he was ready to continue and he lay down. Ms. Brunner was about to begin the scan, but noticed Mr. Yuska was still having difficulty breathing. She called the emergency room and asked Dr. Massingill to come to the CT scan room, and then called a code (the signal that life saving procedures are needed).
Once in the CT scan room, Dr. Massingill administered epinephrine to counter what he diagnosed as respiratory distress and, after some difficulty, intubated Mr. Yuska. Dr. Moller responded to the code and found Mr. Yuska intubated, breathing and unconscious. Dr. Moller began assessing the patient, checking the reactivity of the pupils, the lungs for air movement and the heartbeat and pulse. Suddenly, Mr. Yuska woke up flailing his arms and pulling at the endotracheal tube. Unable to restrain Mr. Yuska, who weighed over 250 pounds, and fearing that he may pull the tube out, Dr. Moller pulled out his pocket knife and cut the tube, thereby deflating the balloon at the end of the endotracheal tube.
Once the tube was deflated, Dr. Moller extubated Mr. Yuska. Initially, Mr. Yuska was breathing on his own; however, his breathing subsequently became very shallow. Unable to reintubate the patient, Dr. Moller used a face mask and ambu bag to move oxygen into Mr. Yuska's lungs. He was then transported to the intensive care unit where the doctors continued resuscitation efforts. CPR efforts were discontinued at 1:14 a.m. on July 24, 1989, and Mr. Yuska was declared dead.
The plaintiffs originally filed suit against HCA Health Services of Louisiana, Inc., d.b.a. Highland Hospital for the wrongful death of Mr. Yuska allegedly caused by the medical negligence of Highland's employees. Plaintiffs also requested a medical review panel which subsequently rendered an opinion finding that neither the hospital nor the doctors failed to meet the appropriate standard of care, that the doctors' conduct was not a factor in the resulting damages, that obtaining informed consent was not possible because of the emergency situation and that informed consent was implied.
The plaintiffs amended their petition and named Dr. Massingill, Dr. Moller and their malpractice insurer as defendants. Before trial, plaintiffs dismissed Highland Hospital from the suit. After a four-day jury trial with numerous expert witnesses, the jury returned a verdict in favor of the defendants finding that their treatment of Mr. Yuska did not fall below the standard of care.
Plaintiffs appeal, arguing that the jury was wrong in finding no liability on the part of Dr. Massingill and Dr. Moller because the evidence clearly shows that the doctors failed to obtain Mr. Yuska's informed consent to the administration of the Conray 43 contrast medium. Plaintiffs also argue that the act of extubating Mr. Yuska fell below the standard of care and contributed to his death. Plaintiffs request they be awarded $5,008.66 for funeral expenses, $4,711.51 for medical expenses incurred by Corey Yuska as a result of his father's death, $250,000 each in wrongful death damages and survival damages proportionate to the loss of chance of survival suffered by Mr. Yuska.

DISCUSSION

Assignment of Error No. 1: Informed Consent
The plaintiffs argue that neither Dr. Massingill nor Dr. Moller obtained the informed consent of Mr. Yuska or his wife for the injection of the Conray 43 contrast medium. While plaintiffs alleged lack of informed consent in both their original and amended petitions, we do not find that this issue was specifically addressed in plaintiffs' closing arguments, *1096 the jury instructions or the jury interrogatories. The record, therefore, does not reflect that this issue was ever presented to the jury. We conclude, nevertheless, that there was informed consent.
Where the circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved therein, the prospects of success, the risks of failing to undergo any treatment or procedure at all and the risks of any alternate methods of treatment. Roberts v. Cox, 28,094 (La.App.2d Cir. 2/28/96), 669 So.2d 633; Smith v. Lincoln General Hospital, 27,133 (La.App.2d Cir. 6/21/95), 658 So.2d 256, writ denied, 95-1808 (La.10/27/95), 662 So.2d 3; Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1988). In a medical malpractice action based on inadequate disclosure of risk information by a physician, the patient must provide evidence to establish prima facie the essential elements of the cause of action. The plaintiff bears the burden of proving the existence of a material risk unknown to the patient, a failure to disclose the risk on the part of the physician, that disclosure of the risk would have led a reasonable patient in plaintiff's position to reject the medical procedure or choose a different course of treatment and injury. Roberts v. Cox, supra; Smith v. Lincoln General Hospital, supra; Hidding v. Williams, 578 So.2d 1192 (La.App. 5th Cir.1991).
The materiality of a risk depends on the existence and nature of the risk and the likelihood of its occurrence. This requires expert testimony. Hondroulis v. Schuhmacher, supra. Materiality also means that a person in the plaintiff's position would attach significance to the particular risk, and this does not require expert testimony. The physician need not disclose risks that are not reasonably foreseeable. Smith v. Lincoln General Hospital, supra.
In the present case, the record shows that Mr. Yuska was a registered nurse who had undergone a previous CT scan with contrast medium, and Mrs. Yuska had undergone two previous CT scans with contrast medium. Karen Brunner, the Highland Hospital CT technician who administered the contrast medium, testified that she examined Mr. Yuska's old records and discovered that he had undergone a previous CT scan and that she had administered the scan. Brunner stated that she discussed the previous CT scan with Mr. Yuska on the night of July 23, 1989.
Ms. Brunner also testified that it was the policy of Highland Hospital in July, 1989, for a member of the radiology department to be responsible for discussing the risks involved with a CT scan. Dr. Massingill testified that this was the procedure followed in all hospitals at which he had worked in the past. Defendants' expert in advanced cardiac life support, Dr. Ronald Alsup, also stated that this procedure was followed at the hospital where he presently worked. Finally, defendants' expert in family medicine and radiology, Dr. Richard Handley, testified that in the hospital where he practices and, generally as a matter of practice in the Shreveport/Bossier City area, the procedure is for the radiology department personnel to discuss the risks of the CT scan with the patient and to question the patient about allergies, previous scans with dye and other disease processes that could have weakened the body. Brunner stated that in addition to discussing the previous scan with Mr. Yuska, she also questioned him about his allergies and discussed the risks involved with the scan and the Conray-43 contrast medium. Mr. Yuska was aware of the risks involved with the CT scan and the contrast medium.
Even assuming, arguendo, that Mr. Yuska was not aware of the risks involved with the CT scan procedure, plaintiffs failed to show that a reasonable person in Mr. Yuska's position would have rejected the CT scan with the contrast medium. Dr. Robert Toth, plaintiffs' medical expert in general medicine and emergency room medicine, testified that 2-3% of patients receiving ionic, iodinated dyes have an adverse reaction. Dr. Handley testified that while one in one thousand or one in two thousand patients may have an allergic reaction to the dye, the general incidence of death is one in one hundred thousand. Regardless of these figures, *1097 Mr. Yuska, a registered nurse, was experiencing a severe headache and had previously undergone the same procedure. The evidence presented at trial does not show that the patient would have rejected this procedure because of the risks involved.
This assignment of error is without merit.

Assignment of Error No. 2: Negligence
The plaintiffs contend that the jury verdict was in error in finding that the doctors did not breach the standard of care in their treatment of Mr. Yuska. They argue that Dr. Moller was negligent when he extubated the patient and that Dr. Massingill was negligent when he allowed Dr. Moller to extubate the patient without informing him of the difficulty with the original intubation.
In a malpractice action based on the negligence of a physician licensed to practice in Louisiana, where the defendant practices in a particular specialty and the alleged acts of medical negligence raise issues peculiar to that specialty, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the same medical specialty. The plaintiff must also prove that the defendant either lacked this degree of skill or failed to use reasonable care and diligence in applying that skill, and that defendant's failure to exercise this degree of care caused plaintiff to suffer injuries that would not otherwise have occurred. LSA-R.S. 9:2794 A; Smith v. Lincoln General Hospital, supra. The mere fact that an injury occurred does not raise a presumption that the physician was negligent. LSA-R.S. 9:2794 C. Roberts v. Cox, supra.
A physician is not held to a standard of absolute precision. Rather, his conduct and judgment are evaluated in terms of reasonableness under then-existing circumstances, not on the basis of hindsight or in light of subsequent events. Iseah v. E.A. Conway Memorial Hospital, 591 So.2d 767 (La.App. 2d Cir.1991), writ denied, 595 So.2d 657 (La.1992). Credibility determinations, including the evaluation of expert testimony, together with the ultimate issue of whether a plaintiff has satisfied his burden of proof are factual issues to be resolved by the trier of fact and will not be disturbed on appeal in the absence of manifest error. Iseah v. E.A. Conway Memorial Hospital, supra.
In the present case, plaintiffs argue that the evidence shows that Dr. Moller should have ordered the CT scan with contrast only after viewing the CT scan without contrast, that Dr. Moller should have used restraints on Mr. Yuska and that Dr. Moller should not have extubated the patient. They also claim that Dr. Massingill should not have allowed Dr. Moller to extubate the patient after he had trouble with the original intubation.
Plaintiffs' only expert witness, Dr. Robert Toth, who was offered as an expert in general medicine and emergency room medicine, testified by video deposition that ordering the CT scan with and without contrast subjected the patient to an unreasonable risk of harm. He stated that the proper procedure would be to order the scan without the contrast medium and have the radiologist review those results before ordering the scan with contrast. He further stated that Dr. Moller should not have extubated Mr. Yuska because the patient had been given a dye known to cause life-threatening reactions in people, there had been difficulty with the intubation and the tube was already in place which allowed the patient's breathing to be controlled. Dr. Toth concluded that Dr. Moller should have restrained Mr. Yuska rather than removing the tube.
Dr. Moller testified that he extubated Mr. Yuska for a number of reasons, one being that the patient had become combative and was pulling on the endotracheal tube. If Mr. Yuska had pulled out the tube without the balloon at the end being deflated, he could have done substantial harm to himself. Dr. Moller also feared that Mr. Yuska had a berry aneurysm and any agitation could cause the aneurysm to rupture. In addition, there were no restraints in the CT scan room, and, as previously stated, Mr. Yuska weighed over 250 pounds. Finally, Dr. Moller believed that the patient was alert and breathing on his own and no longer in need of the endotracheal tube which prevented him from talking to the doctors. Dr. Moller testified that he did not believe the extubation caused Mr. Yuska's death and that Dr. *1098 Massingill's actions during this event met the standard of care.
Although Dr. Massingill testified on cross-examination that he "silently disagreed" with the decision to extubate, he stated on direct examination that the extubation was a reasonable option under the circumstances. Dr. Massingill further stated that the events happened so quickly there was not time for him and Dr. Moller to discuss whether the tube should be removed. He also said that Mr. Yuska was fighting and struggling to pull the tube out of his throat. Finally, Dr. Massingill testified that he felt none of his actions that night contributed to Mr. Yuska's death and that Dr. Moller's acts met the standard of care.
Caddo Parish Coroner, Dr. George McCormick, the defendants' expert in internal medicine and forensic pathology, and the doctor who performed the autopsy on Mr. Yuska's body, was asked on direct examination, "Do you believe that act of extubation more likely than not was the cause of this man's death?" His answer was no. He stated that both Dr. Moller and Dr. Massingill met the standard of care. Dr. McCormick also told the jury that the decision whether or not to extubate is a clinical judgment, which is an art, and that he would have done whatever he thought was correct at the time.
Dr. Ronald Alsup, defendants' expert in advanced cardiac life support, a practicing internist and a member of the medical review panel in this matter, testified that both Dr. Moller and Dr. Massingill acted appropriately in this situation and met the standard of care. Dr. Alsup stated that, based on the evidence in this case, he would have made the same decisions made by Dr. Moller. Dr. Alsup further testified that he generally does the CT scan without the contrast medium and then immediately does the scan with the contrast medium in an effort to expedite the work-up time. Finally, Dr. Alsup concluded that the extubation was not the cause of Mr. Yuska's death.
Dr. Richard Handley, the defendants' expert in family practice medicine and radiology and a member of the medical review panel in this matter, testified that both Dr. Moller and Dr. Massingill acted appropriately and that none of their acts caused Mr. Yuska's death. Dr. Handley stated that given the circumstances of such a large patient trying to tear out an inflated endotracheal tube, he would have extubated Mr. Yuska.
Finally, Dr. Lex Hubbard, defendants' expert in internal medicine, pulmonolgy and anesthesiology, who testified by deposition, concluded that Dr. Moller met the standard of care. He said that the extubation did not lessen the patient's chance of survival. Dr. Hubbard also stated the fact that Mr. Yuska was breathing spontaneously, had an adequate heart rate and was a large combative patient attempting to remove the inflated endotracheal tube supported the act of extubation.
Dr. Toth, the only expert to testify that the doctors' actions fell below the standard of care had not practiced emergency room medicine since 1978. The other four medical experts were all actively practicing in their respective areas of medicine and concluded that neither Dr. Moller nor Dr. Massingill fell below the standard of care in their treatment of Mr. Yuska. From the evidence presented in this record, we cannot conclude that the jury was clearly wrong in its evaluation of the expert testimony, or in its ultimate determination that neither Dr. Moller nor Dr. Massingill fell below the standard of care in extubating Mr. Yuska.
This assignment of error is without merit.
The plaintiffs' third assignment of error involves the issue of damages. Our conclusions, however, that there was no lack of informed consent and that the jury was not clearly wrong in finding that the doctors were not negligent, preclude us from deciding the damages issue.

CONCLUSION
For the reasons expressed, we affirm the jury verdict and the judgment of the trial court. The costs of this appeal are assessed to the appellants.
AFFIRMED.
WILLIAMS, J., concurs.