I .STEWART, J.
This appeal arises from a medical malpractice action. The plaintiff-appellant, Margaret Fluck, appeals the trial court judgment granting a Motion for Summary Judgment in favor of the defendant-appel-lee, Leslie R. Coffman, M.D. We affirm.
FACTS
In October 1994, Margaret Fluck (“Mrs.Fluck”) sought medical attention from Dr. Leslie R. Coffman (“Dr. Coff-man”) for urinary incontinence. Dr. Coff-man, an obstetrician/gynecologist (OB/GYN), has his principal place of business is in Monroe, Louisiana. Dr. Coff-man performed bladder suspension surgery (an anterior cystrourethropexy) on Mrs. Fluck on November 8, 1994. During Mrs. Fluck’s hospitalization, Dr. Coffman sutured a urinary catheter into place.
On November 10, 1994, Bessie Herring, R.N. (“Nurse Herring”), attempted to remove the catheter, but her attempt to do so was painful. Nurse Herring then cut off the majority of the catheter so that there were only a few inches extending out of Mrs. Fluck’s body. Mrs. Fluck was placed in stirrups so that Dr. Coffman could remove the catheter. Although Mrs. Fluck cried out in pain as Dr. Coffman attempted to remove the catheter, he made several more failed attempts to remove the catheter while pressing on Mrs. Fluck’s abdomen. Dr. Coffman consulted a urologist, Dr. Edwin O. Edgerton, III, who performed a cystoscopy, removing the suture and catheter. Subsequently, Mrs. Fluck’s bladder suspension failed and the urinary incontinence continued.
On October 11, 1995, Mrs. Fluck was admitted to Willis-Knighton Medical Center in Shreveport, Louisiana. Mrs. Fluck was diagnosed with recurrent urinary stress incontinence, status post anterior urethropexy and dyspareunia. While hospitalized, Dr. Thomas E. Palmer (“Dr.Palmer”) performed a RAZ urethro-pexy | gon Mrs. Fluck and Dr. Sam Burke, OB-GYN, performed a release of the vaginal scar.
Mrs. Fluck filed a complaint with the Patient’s Compensation Fund on November 7, 1995. On January 22, 1997, the Medical Review Panel rendered an opinion that exonerated Dr. Coffman of responsibility. On April 21, 1997, Mrs. Fluck filed suit under the Louisiana Medical Malprac *81 tice Act. The suit alleged that as a result of Dr. Coffman’s negligence, Mrs. Fluck has had to undergo further surgical intervention, pain and suffering, mental anguish and distress, sexual dysfunction, economic damages and additional medical bills, while her husband suffered a loss of consortium.
On July 1, 1998, Dr. Coffman filed a Motion for Summary Judgment, with numerous exhibits attached, alleging that plaintiffs petition should be dismissed for lack of any genuine issues of material fact. Alternatively, Dr. Coffman asked the court to grant partial summary judgment in his favor as there was no evidence that he either caused or contributed to the alleged serious physical and emotional problems which Mrs. Fluck claimed to have suffered subsequent to the surgery. On July 20, 1998, the plaintiffs filed a Motion in Opposition, including affidavits and a deposition, to the defendant’s Motion for Summary Judgment.
The trial court rendered judgment granting the appellee’s Motion for Summary Judgment. The appellants now appeal the summary judgment, urging that genuine issues of material fact exist.
DISCUSSION
Appellate courts conduct a de novo review of the documentation supporting and opposing summary judgment under the same criteria which governs the trial court’s determination of whether summary judgment is appropriate, i.e., whether there is any issue of material fact and whether the movant is entitled to judgment]^ a matter of law. Rance v. Harrison Company, Inc., 31,508 (La.App.2d Cir.1/20/99), 737 So.2d 806.
La. C.C.P. art. 966 provides, in part:
A.(1) The plaintiff or defendant in the principal or any incidental action, with or without supporting affidavits, may move for a summary judgment in his favor for all or part of the relief for which he has prayed. The plaintiffs motion may be made at any time after the answer has been filed. The defendant’s motion may be made at any time.
(2) The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969. The procedure is favored and shall be construed to accomplish these ends.
B. The motion for .summary judgment and supporting affidavits shall be served at least ten days before the time specified for the hearing. The adverse party may serve opposing affidavits prior to the date of the hearing. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.
C. (1) After adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted.
(2) The burden of proof remains with the movant ...
The plaintiff, movant herein, bears the burden of proving the defendant’s liability at trial.
La. C.C.P. art. 967 provides, in pertinent part:
When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.

Informed Consent

The appellants urge that there was a lack of informed consent, that there are genuine issues for trial and that a determi *82 nation of informed consent is a jury issue. Mrs. Fluck urges that while the form she signed does indeed state that a catheter |4would likely be placed in her bladder for a few days following surgery, it does not state that the catheter might inadvertently or negligently, be sutured into place by Dr. Coffman during the surgery or that he might use unnecessarily intense force in his efforts to remove the catheter without first cutting the suture.
According to Mrs. Fluck, the Medical Review Panel found that suturing a catheter in place during the procedure is a “recognized risk” of the procedure and that Dr. Coffman does not deny that he did not explain this risk to the patient. Mrs. Fluck argues that if indeed such a risk is a recognized risk, then the risk must be told to the patient. That risk must be told to the patient preoperatively so that the patient has the opportunity to make an informed decision about her own healthcare. Mrs. Fluck contends that had she been told of the risk, then she would have questioned Dr. Coffman at the time and would have been in a position to request a urological consultation before Dr. Coffman did extensive damage in his efforts to remove the catheter.
However, Dr. Coffman argues that there was no lack of informed consent, that a consent form was signed by Mrs. Fluck on November 1, 1994 and that although the consent form did not specifically state that there was a risk that the catheter might inadvertently be sutured in place during the surgery, other complications were specifically mentioned. Dr. Coffman further argues that the appellants have never suggested that had he advised Mrs. Fluck that there was a chance that the catheter might inadvertently be sutured in place that she would have refused the surgery. The fact that this one risk was not specifically listed in the consent form is immaterial, and certainly not sufficient grounds for reversal of the trial court’s decision in his favor.
Generally, where the circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the l^risks involved therein, the prospects of success, the risks of failing to undergo any treatment or procedure at all and the risks of any alternate methods of treatment. Yuska v. HCA Health Services of Louisiana, Inc., 28,878 (La.App.2d Cir.12/11/96), 684 So.2d 1093; Roberts v. Cox, 28,094 (La.App.2d Cir.2/28/96), 669 So.2d 633; Elkins v. Key, 29,977 (La.App.2d Cir.10/29/97), 702 So.2d 57.
LSA R.S. 40:1299.40, dealing with consent to medical treatment states in pertinent part:
A. (1) Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts ...; exception; Louisiana Medical Disclosure Panel; availability of lists to establish necessity and degree.
The Louisiana Supreme Court has determined that in cases raising the issue of lack of informed consent, the patient bears *83 the burden of proving four (4) elements: 1) the existence of a material risk unknown to the patient; 2) the failure of the physician to disclose that risk; 3) that disclosure of the risk would have led a reasonable patient in the plaintiffs position to reject the medical procedure or choose a different course of treatment; and 4) injury. Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1988).
In the present case, Dr. Thomas Evan Palmer (Dr. Palmer), a urologist practicing in Shreveport, testified by deposition that suturing the catheter is a complication which can occur and does occur notwithstanding the best efforts of |fithe surgeon to avoid this type of inadvertent suture. “You don’t directly visualize the catheter, the needles are pretty sharp, and you can put a needle through a catheter and not meet any additional resistance other than you would normally meet from the tissues themselves. I ask the surgical nurse to remove the catheter during the procedure just so I can make sure that it’s not sewn in.” Dr. Palmer further testified that he was not trained during his residency to check the catheter and that he picked it up as a matter of practice. It is not a common thing to have happen. “I don’t think it is medical malpractice if the catheter is sutured in.” Dr. Palmer opined that it is a recognized but an uncommon complication with this type of surgey.
Dr. Hoyet Chance (“Dr. Chance”), a urologist practicing in Shreveport and a partner of Dr. Palmer, testified as the plaintiffs expert by deposition. Dr. Chance testified that when he performs the procedure he has a scrub nurse remove the catheter at the conclusion of the procedure to determine whether it has been inadvertently sutured. “You don’t have anyway of knowing that you placed a suture into the catheter. You’re in a deep hole ... But anybody can place a suture into a catheter that’s doing this kind of surgery. I think that’s an acceptable complication, personally.” Furthermore, when Dr. Chance was asked whether prior to performing the type of surgical procedure that was done by Dr. Coffman, he indicated to his patient as a part of obtaining consent that there is a possibility of an inadvertent suturing of a catheter, Dr. Chance responded, “No.”
After reviewing the record, exhibits, and depositions, we find that Mrs. Fluck failed to satisfy the burden of proving the four elements set forth by the Louisiana Supreme Court in Hondroulis, supra. The risk was a recognized risk but not a material risk and a reasonable prudent person in Mrs. Fluck’s position would have consented to the procedure had the risk of suturing the catheter been [7disclosed. Therefore, there exist no specific facts showing that there is a genuine issue for trial.

Standards of Care

La. R.S. 9:2794(A) provides that a plaintiff in a medical malpractice shall have the burden of proving:
“(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, ... under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.”
In brief, the appellants urge that Dr. Coffman used excessive force in attempting to remove the catheter, that Dr. Coffman violated his standard of care by negligently suturing the catheter in place, *84 that the initial surgery failed due to Dr. Coffman's aggressive attempts to remove the catheter, and that there exists genuine issues of material fact.
Mrs. Fluck contends that the Medical Review Panel opinion recognizes that a dispute exists regarding (1) the amount of force, the intensity, and the nature of the efforts made by Dr. Coffman to remove the urinary catheter which he had negligently sutured within Mrs. Fluck’s vagina and (2) regarding Mrs. Fluck’s allegations that Dr. Coffman deviated from the accepted standard of care, that his treatment and care had caused the attempted surgical repair of her problems to fail and Dr. Coffman’s denial that he deviated from the accepted standard of care and denial that his surgery or follow-up care caused any harm.
|sIn opposing the defendant’s motion for summary judgment, Mrs. Fluck introduced a portion of the Medical Review Panel opinion which stated, in pertinent part:
Dr. Coffman arrived and attempted to remove the catheter. According to Dr. Coffman and Nurse Herring, these attempts were gentle, but unsuccessful. According to Mrs. Fluck, the attempts were aggressive and caused her pain. Dr. Coffman suspected that the catheter may have been sutured during the surgery and called for a consultation with Dr. Ed Edgerton, a West Monroe urologist, since the catheter had already been cut.
In further opposition to the defendant’s motion for summary judgment, the affidavits of the appellants were introduced as well as the affidavits of a number of lay witnesses. Mrs. Fluck urges that the affidavits demonstrate that the account proffered by Dr. Coffman and Nurse Herring differ from that of the other witnesses, establishing a genuine issue of material fact. Although Dr. Coffman and Nurse Herring describe Dr. Coffman’s efforts as gentle, witnesses confirm that they heard Mrs. Fluck screaming on several different occasions during Dr. Coffman’s examination and that they heard Mrs. Fluck begging Dr. Coffman to please stop, proving that he did not discontinue his attempts when it was evident that he was being unsuccessful and causing intense pain. Furthermore, the affidavit of Betty Fox confirms that she examined Mrs. Fluck’s abdomen the following day and found numerous bruises on her abdomen where Dr. Coffman had placed his hands and pushed so aggressively as to cause intense bruising.
Mrs. Fluck further argues that Dr. Coff-man was obligated to manipulate the catheter following the surgery to make certain that he had not inadvertently sutured it into place and had not violated the standard of care. Mrs. Fluck contends that the testimony of Dr. Chance confirms that if Dr. Coffman manipulated the catheter as described by Mrs. Fluck and her witnesses, then such unnecessary efforts would cause the failure of the initial surgical repair as subsequently occurred and that any physician who performed the surgery that Dr. Coffman performed on Mrs. Fluck | ^should remove the catheter at the end of the surgery and reinsert it for the purpose of assuring that the catheter had not been inadvertently sewn into place. Therefore, Mrs. Fluck concludes that a determination of the applicable standard of care is clearly a genuine issue of material fact based upon the contradictory opinions of the expert witnesses.
On the other hand, the appellee argues that he did not aggressively pull on the catheter, that Nurse Herring directly recalls that he gently examined the perineum and manipulated the catheter, and that after realizing that removal of the catheter was not possible he suspected that the catheter was sutured in and consulted with Dr. Edgerton. After consultation, Dr. Coffman turned over the patient’s catheter removal care to him.
In furtherance, the appellee argues that he did not violate his standard of care, that he was not negligent in suturing the cathe *85 ter in place and that he did not commit medical malpractice. In support of this position, the appellee cites Wainwright v. Leary, 623 So.2d 233 (La.App. 2d Cir.1993) in which this court held that a physician will be held to neither a standard of perfection nor evaluated with benefit of hindsight and that opinions from medical experts are necessary to determine both the applicable standard of care, and whether that standard was breached.
Dr. Coffman further argues that only one expert witness, Dr. Chance, has been critical of him. Dr. Chance admitted that he is not an OB/GYN, and is not familiar with the standard of care of that speciality. Furthermore, Dr. Palmer, who was Dr. Chance’s partner and the surgeon who performed a subsequent RAZ urethropexy on Mrs. Fluck, found Dr. Coffman to have used reasonable care along with his best judgment in treating Mrs. Fluck. Dr. Palmer testified that the suturing of a catheter into the urethra is a complication that sometimes happens Imnotwithstanding a surgeon’s best efforts to avoid it, as the catheter cannot be seen during suturing.
As for the allegation that the initial surgical procedure failed due to Dr. Coffman’s attempts to remove the catheter, Dr. Coff-man argues that the appellant failed to establish a casual connection between the alleged negligence and the injury sustained, that his postoperative notes showed that Mrs. Fluck stated that she was able to urinate and that after the procedure to remove the catheter, Dr. Edgerton noted that “her bladder appears well supported.” Even Dr. Chance, the appellant’s expert, could not state that it was unusual for this initial procedure to fail, or that it was Dr. Coffman’s fault.
Finally, the appellee argues that it is essential in a medical malpractice suit that plaintiffs have experts to substantiate their claims. The appellant produced no evidence nor any expert testimony to show that the standard of care was breached. Therefore, Dr. Coffman concludes that the trial court correctly granted the Motion for Summary Judgment because no genuine issue as to material fact exists and that the appellant failed to satisfy the three (3) elements of LSA-R.S. 9:2794.
In a malpractice action against a physician who practices in a particular specialty, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians in that specialty; that the defendant either lacked this degree of skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and that as a proximate result of the breach the plaintiff suffered injuries that would not otherwise have been incurred. La. R.S. 9:2794 A; Elliott v. Robinson, 612 So.2d 996, 1006 (La.App. 2d Cir.1993); Tedeton v. Coffman, 544 So.2d 35 (La.App. 2d Cir.1989). Expert testimony is essential in establishing the standard in a case of medical malpractice. Tedeton v. Coffman, supra; Steinberg v. Indemnity Ins. Co. of N. Amer., 364 F.2d 266 (5th Cir.1966).
|nA physician is not held to a standard of absolute precision. Rather, his conduct and judgment are evaluated in terms of reasonableness under then-existing circumstances, not on the basis of hindsight or in light of subsequent events. Elkins v. Key, 29,977 (La.App.2d Cir.1997), 702 So.2d 57; Yuska, supra; Iseah v. E.A. Conway Memorial Hospital, 591 So.2d 767 (La.App. 2d Cir.1991), writ denied, 595 So.2d 657 (La.1992). The mere fact that an injury occurred does not raise a presumption that the physician was negligent. LSA-R.S. 9:2794(C).
In support of his position, and in order to prove that he was entitled to judgment, Dr. Coffman presented to the trial court his own deposition, as well as the depositions of Dr. Edgerton, who surgically removed the catheter, Dr. Palmer, who performed the follow-up RAZ urethropexy and the medical review panel opinion which concluded that Dr. Coffman did not breach the standard of care.
*86 In their depositions, both doctors stated unequivocally that Dr. Coffman’s actions, regarding his treatment of Mrs. Fluck, were within the degree of care exercised by physicians who perform bladder suspension surgery, and were reasonable under the circumstances. More specifically, Dr. Palmer testified as follows:
Q. And as I appreciate your knowledge of this case, you don’t have any information at all based on the documentation that you have reviewed that would indicate that Dr. Coff-man failed to comply with the appropriate standard of care in his treatment of this patient, do you?
A. I can’t see anything in the chart that would lead me to believe that that’s the case.
In his testimony, Dr. Palmer emphasized that OB-GYN’s perform this type of surgery on a fairly regular basis and that is not outside the scope of their expertise. Dr. Palmer testified that just 15% of the bladder suspensions don’t work. “They just don’t work all the time despite our best efforts.”
| ^Furthermore, Dr. Edgerton’s office record reflects that Mrs. Fluck’s bladder was well supported. Dr. Edgerton noted that Dr. Coffman tried as he did to gently remove the catheter which would not come out and that he thinks that it was entirely appropriate that Dr. Coffman consulted urology when he discovered that there was a problem in removing the catheter. Dr. Edgerton further stated that he was subsequently successful in removing the catheter.
Dr. Don Marx, a urologist who treated Mrs. Fluck, noted that he “did not find any injury as the result of the incontinence repair other than the fact it did not hold. As you know, these procedures are not guaranteed.” Dr. Chance testified that in approximately 20% of the cases of patients who have this surgery performed, they ultimately have their bladder drop and their physical problems recur.
After reviewing the record and depositions, we find that none of the experts testified that the standard of care was breached. Rather, the experts testified that anybody can inadvertently place a suture into a catheter because of the lack of visibility when performing this type of surgery and that it is rare or uncommon but it happens. The expert testimony presented by Drs. Palmer and Chance were in agreement regarding the standard of care for a patient in Mrs. Fluck’s condition, and Dr. Coffman’s adherence to that standard in his treatment of Mrs. Fluck.
In furtherance, the opinion of the Medical Review Panel reveals that the evidence did not support a finding that Dr. Coffman breached the applicable standard of care. In fact the panel’s opinion stated:
“Dr. Coffman not manipulating the catheter before closing his original surgery is not a deviation from the accepted standard of medical care. While this technique is employed by some surgeons, including Dr. Palmer ... even he did not take the position that it is a required technique. Both Dr. Palmer and Dr. Burke found that Dr. Coffman’s surgical technique met the required standard of care and with this position we are in agreement. We are unable to conclude that anything Dr. Coffman did resulted in the failure of the retropubic cystopexy ...”
| iSFirst, Dr. Coffman properly established the degree of care ordinarily exercised by internists under these circumstances, the first element of a medical malpractice claim. Second, and more important, Dr. Coffman established that he did not lack knowledge or skill, nor did he fail to use reasonable care and diligence, along with his best judgment in treating Mrs. Fluck, the second element of a medical malpractice claim. The plaintiffs did not present any expert or other testimony or evidence which would indicate that the standard of care was breached in this instance, a showing necessary to refute Dr. Coffman’s proof of compliance with the *87 standard, or proof that a genuine issue of material fact remained. The plaintiffs are not only required to present proof of the standard of care and that Dr. Coffman violated that standard, but they must also present proof of the third element of a medical malpractice claim; namely, that as a proximate result of the alleged breach in the standard of care, Mrs. Fluck suffered injuries that would not otherwise have been incurred. Even if a jury would be able to infer negligence from Dr. Coff-man’s attempt to remove the catheter, the plaintiffs presented no proof that there was a causal connection between Mrs. Fluck’s bladder suspension failure and Dr. Coffman’s attempt to remove the catheter. Therefore, we conclude that Dr. Coffman presented sufficient evidence, through the depositions and medical review panel opinion, that he was entitled to judgment as a matter of law.
CONCLUSION.
For the foregoing reasons, we affirm the trial court judgment. The costs of this appeal are assessed to the appellants, Margaret Fluck, et vir.
AFFIRMED.